UNDERSEA ENGINEERING & CON-
STRUCTION CO., Inc., an Hawaii Cor-
poration, and Shelton Engineering Con-
tractors, Ltd., an Hawaii Corporation,
Plaintiffs-Appellants,

v.

INTERNATIONAL TELEPHONE & TEL-
EGRAPH CORPORATION, dba ITT
Federal Laboratories, a Division of In-
ternational Telephone & Telegraph Cor-
poration, a Maryland Corporation, also
known as ITTFL, also known as ITT,
and Healy-Tibbitts Construction Co., a
California Corporation, Defendants-Ap-
pellees.

No. 23729.

United States Court of Appeals,
Ninth Circuit.

June 18–22, 1970.

Rehearing Denied July 21, 1970.

544

Joseph A. Ryan (argued), of Ryan & Ryan, Honolulu, Hawaii, for appellants.

William R. Loomis (argued), of Henshaw, Conroy & Hamilton, Honolulu, Hawaii, for appellees.

Before JERTBERG, BROWNING and HUFSTEDLER, Circuit Judges.

PER CURIAM:

Appellants, Undersea Engineering & Construction Co., Inc., an Hawaii corporation, and Shelton Engineering Contractors, Ltd., an Hawaii corporation, plaintiffs in the district court, appeal from the judgment entered by the district court following an order granting appellees' (defendants below) [International Telephone & Telegraph Corporation, a Maryland corporation, and Healy-

Tibbitts Construction Co., a California corporation] motion for summary judgment, and "from the Order denying the Affidavit of Disqualification and Certificate requesting that the Chief Judge of the Court of Appeals, Ninth Circuit to make an independent selection of a judge to preside over this case and from the Order imposing costs and attorney's fees thereon to defendants."

We have examined the record upon which the district court acted in granting the motion for summary judgment, and are satisfied that such record presents no genuine issue as to any material fact and that the appellees were entitled to judgment as a matter of law. Rule 56, Fed.Rules of Civil Proc. The district court's written decision on the motion for summary judgment is attached as an appendix to this opinion. The decision contains a statement of the undisputed material facts presented by the record, and correctly disposes of appellants' contentions on this appeal, which merit discussion.

The judgment appealed from is affirmed for the reasons and on the authorities contained in the decision.

■ The orders appealed from are, and each of them is, affirmed The Affidavit to disqualify the district judge was clearly insufficient. See Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1920); United States v. Grinnell Corporation, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The mere filing of an Affidavit does not automatically disqualify the judge. He has authority to decide whether the claim of bias is legally sufficient. Wolfson v. Palmieri, 396 F.2d 121 (2d Cir. 1968); Behr v. Mine Safety Appliances Co., 233 F.2d 371 (3d Cir.), cert. denied 352 U.S. 942, 77 S.Ct. 264, 1 L.Ed.2d 237 (1956); Price v. Johnston, 125 F.2d 806 (9th Cir. 1942).

■ The hearing on the demand for disqualification reveals that the grounds stated in the Affidavit were frivolous, if not groundless and vexatious. In these circumstances it was within the district court's discretion to impose sanction. See Local No. 149 I. U., U. A., A. & A. I. W. etc. v. American Brake Shoe Co., 298 F.2d 212, 214–215 (4th Cir. 1962).

## APPENDIX

UNDERSEA ENGINEERING & CONSTRUCTION CO., INC., a Hawaii Corporation, and Shelton Engineering Contractors, Ltd., a Hawaii Corporation,

*Plaintiffs,*

vs.

INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, doing business as ITT Federal Laboratories, a Division of International Telephone and Telegraph Corporation, a Maryland Corporation, also known as ITTFL, also known as ITT, and Healy-Tibbitts Construction Co., a California Corporation,

*Defendants.*

Civil
No. 2766

In the United States District Court
for the District of Hawaii

**546**

## DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant International Telephone and Telegraph Corporation (ITT), as prime contractor, entered into a contract with the United States Navy to install a hydrophone system offshore of Kauai in Hawaii. Plaintiffs Undersea Engineering & Construction Co., Inc. (Undersea) on June 10, 1966 entered into a subcontract, #SK-714559, with ITT to perform certain work on ITT's job. Plaintiff Shelton Engineering Contractors, Ltd. (Shelton) was a sub-subcontractor to Undersea. Between June of 1966 and April of 1967 there occurred work changes, claims by Undersea for time delay losses, claims by ITT against Undersea for poorly performed work, claims by Undersea that ITT was not performing or paying Undersea as provided under the contract, etc., and beginning in April of 1967 demands and threats of suit made by Undersea against ITT. In September 1967 there followed a payment by ITT to Undersea and a general release signed by Undersea.

Thereafter, in November 1967, Undersea and Shelton filed this suit against ITT and Healy-Tibbitts Construction Co. (Healy-Tibbitts), also a subcontractor on the job whose barge had been involved in damage to a mooring installation made by Undersea.

To avoid the impact of the release it had executed, Undersea alleged that it had executed the release only because of economic coercion by ITT. Defendants answered, denying the plaintiffs' claims and alleging certain setoffs and counterclaims, which were thereafter denied by the plaintiffs. The defendants have filed a motion for summary judgment accompanied by affidavits and exhibits in support thereof. Plaintiffs thereafter filed counter-affidavits and exhibits, and the motion was argued before this court.

By their complaint plaintiffs' claims are substantially as follows:

1. *Contract Claim*—Count I—Undersea against ITT (paragraphs 7(A), 7(B), 10 and 11) for $44,970.40 for overhead expense and loss of profit because of ITT's non-use of certain support services (vessels, divers, etc.) under paragraph 2 of the subcontract (Defendants' Exhibit 2).[1]

2. *Contract Claim*—Count II—Undersea against ITT (paragraph 7(C), 12 and 13) for $126,256 for underwater work done under the subcontract but not paid for by ITT.

3. *Quasi-Contract Claim*—Count V—Undersea against ITT (paragraphs 7(A), 7(B), 7(C), 19, 20 and 21) for unjust enrichment under the subcontract, seeking the same amount of recovery as sought in Counts I and II, differing only in theory of recovery.

4. *Tort Claim*—Count III—Undersea against ITT and Healy-Tibbitts (paragraphs 7(D), 14 and 15), whereby Undersea seeks $36,077.36 for damage to an offshore four-point vessel moor constructed by Undersea under the subcontract.

5. *Economic Coercion Claim*—Count VI—Undersea against ITT (paragraphs 7, 22, 23, 24 and 25), whereby Undersea alleges wrongs inflicted upon it by ITT, pleads the settlement agreement, and seeks to have it set aside or avoided as having been made under economic coercion.

6. *Shelton Quasi-Contract Claim*—Count IV—Shelton against ITT (paragraphs 7, 16, 17 and 18), whereby Shelton, a sub-subcontractor under Undersea, claims damages from ITT, the prime contractor, under a quasi-contract theory for alleged services rendered, materials supplied and moneys advanced to Undersea in the amount of $88,290.15.

Subcontract SK-714559 was executed by Undersea and ITT in June 1966. The record is perfectly clear that very

---
1. All exhibits hereafter referred to are defendants numbered exhibits.

shortly thereafter, *four chief areas of dispute* arose between Undersea and ITT:

1. *Support Services Claim*—Count I. The subcontract provided that Undersea would make available to ITT vessels, divers, and other support services on an "as required" basis at a per diem or weekly rate for support services actually rendered. Undersea maintained that ITT was obligated to use Undersea services for all requirements ITT might have for any such support services. ITT claimed that it need utilize only such services as it might, in its election, request, and this area of dispute was clearly identified as early as November 17, 1966 in a letter from Undersea to ITT (Ex. 3) and ITT's rejection of Undersea's contentions by its letter of March 29, 1967 (Ex. 19). Undersea, by letter of April 5, 1967 (Ex. 22), nevertheless made a claim of overhead and loss of profit for the support services not utilized by ITT. This claim never did reflect a liquidated sum.

2. *Delay Charge Claim*—Count II. Certain portions of Undersea's contract could not be done until the cable-laying ship "Giant", under charter to ITT by North American Aviation, Inc., arrived off Kauai. Under ITT's charter agreement the "Giant" was to have arrived in August 1966, but due to factors over which ITT had no control, it did not arrive until February 11, 1967. This delay held up certain work of Undersea, and Undersea as early as December 13, 1966 (Ex. 4) notified ITT of its intention to claim for "delay charges" while its equipment and personnel were on a forced standby basis, and by letter dated January 13, 1967 (Ex. 7) Undersea claimed $27,744.92 as "delay charges". This was an unliquidated claim. On February 15, 1967 (Ex. 10) ITT rejected that claim.

Undersea on March 1, 1967 (Ex. 11) notified ITT it would continue under the subcontract but would reserve its rights as to the delay charge claim. By letter of April 4, 1967 (Ex. 21), Undersea again made a delay charge claim (some three times higher than the January 13 claim). This, too, was an unliquidated claim. By letter dated April 11, 1967 (Ex. 25), ITT simply said it was "reviewing the claim."

3. *Price Increase Claim*—Count II. Basing its claim upon the contention that the delays had thrown its performance under the subcontract from the calm summer months into the winter bad weather months, Undersea, on January 13, 1967 (Ex. 7), demanded of ITT an increase in price for certain portions of the job, asking an estimated sum of $41,600. On February 15, 1967 (Ex. 10) ITT rejected any claim for additional compensation.

On March 1, 1967 (Ex. 11), Undersea notified ITT it would continue to perform under the subcontract but reserved the right to a price increase claim, and on March 20, 1967 (Ex. 17) Undersea again notified ITT it intended to reassert its claim for an increase in price. By two letters of April 5, 1967 (Ex. 22 and 23), Undersea again presented a claim for an increase in the contract price due to the delays, etc., and on April 11, 1967 (Ex. 25) ITT notified Undersea its claim was being reviewed.

4. *Supplement No. 1 Dispute*—Count II. During certain negotiations between January 6 and 13, 1967, the parties agreed upon certain modifications of the scope of work and a reduction of the total fixed-price portion of the subcontract to $170,000, and by letter dated January 26, 1967 (Ex. 9) Undersea acknowledged that a reduction in price had been negotiated. Then, on March 23, 1967 (Ex. 18), Undersea informed ITT that the amendment would not be accepted until ITT acknowledged it would pay Undersea the support services claim, delay charge claim, and price increase claim.

On March 29, 1967 (Ex. 19) ITT notified Undersea that the negotiated amendment was in effect, and thereafter made claims against Undersea for defective work and of its own intention to make claims against Undersea therefor (Ex. 25).

There is only one conclusion which can be drawn from the above uncontested facts, viz., all of these four claims were the subjects of dispute by April 5, 1967, at which time Undersea could have treated the subcontract as terminated and sued ITT upon its claims, but it did not do so. While Undersea continued to perform the subcontract—rather than terminate and sue—Undersea nevertheless fired a barrage of suit-threat letters manifestly intended to high-pressure ITT into recognition and settlement of the disputed claims.

On May 2, 1967 (Ex. 26), David M. Glickman, vice-president of Undersea, an attorney at law admitted to practice in the State of California, wrote to ITT, as an attorney, demanding that it immediately negotiate and pay Undersea's claims, then inferentially threatening that if the claims were not paid, Undersea would sue for such damages as would "hurt the defendant, by way of punishment", etc. Thereafter on May 29, 1967 (Ex. 28), ITT advised Undersea that its legal department would contact Glickman, and by the same communication ITT again laid out the areas of Undersea's defective or incomplete work and demanded immediate corrective action. On June 7 and 14, 1967 (Ex. 30 and 31) ITT again demanded that Undersea complete its defective work and indicated that it had paid Undersea $143,305, or 84%, of the total fixed-price portion of the subcontract (as renegotiated), outside of other sums paid.

On June 20, 1967 (Ex. 32) Glickman again writing as "attorney at law", informed ITT he was drafting a complaint against ITT and the United States for the Undersea claims and that Undersea would also make a multi-million dollar claim for punitive damages, and indicated that a carbon copy of the letter was being sent to the Contracting Officer of the Naval Air Systems Command, ITT's employer under the prime contract.

On June 20, 1967 (Ex. 33) ITT advised Undersea that "it is the intention of ITT Federal Laboratories to negotiate a realistic settlement and this company's counterclaims which have arisen under Subcontract 714559." Thereafter, on July 7, 1967, ITT's and Undersea's officers in Honolulu attempted but failed to reach a settlement. On July 17, 1967 (Ex. 35), as requested by Undersea, ITT set forth a list of setoffs amounting to $69,708. On August 3, 1967 (Ex. 36), Glickman rejected each offset claim as invalid. Then on August 15, 1967 (Ex. 40) Glickman threatened that if Undersea did not receive the money "it had coming" from ITT it would bring suit "for approximately $200,000.00 in compensatory damages" and "One Hundred Million Dollars ($100,000,000.00) punitive damages, because of the malice and economic oppression of ITTFL against our company (including the statement openly made, 'We're going to break you financially.')" Glickman also threatened "to print 2,000 copies of all legal documents" filed and to "send a copy of each one to: every congressman and senator, the governor of every state of the union, the Public Utilities Commission of every state, the heads of state of the 57 countries in which I. T. T. does business, the wire services and the editors of principal U. S. and foreign newspapers, and every company with which I. T. T. does business", and that it would continue to keep all of the above "entities informed * * * throughout the two or three years that the law suit will be in progress." Glickman also threatened that they would "make an immediate, formal complaint against I. T. T. with the United States Department of Justice", as well as the Federal Communications Commission. He then concluded his letter by offering to settle for $108,000.

On September 19, 1967 (Ex. 44) Glickman wrote to Mr. H. D. Fugitt, Contracting Officer, Department of the Navy, Naval Air Systems Command, Washington, D. C. 20360, with carbon copy addressed to Harold S. Geneen, President of ITT, stating that ITT owed

Undersea nearly $200,000 under the sub-contract, threatened that Undersea was going to file suit against ITT and would have to include the U. S. Navy, and concluded that "if your office has not yet paid I.T.T. for the work in question, you may wish to withhold payment."

On September 22, 1967 (Ex. 45) ITT set out its position concerning the validity of Undersea's claims and ITT's counterclaims. Then stated: "[W]e are prepared to offer UEC the sum of $40,000.00 in full settlement of all claims and counterclaims arising out of this transaction. * * * In the event UEC accepts this offer we would expect UEC to forward to us a general release from any and all claims it might have against ITTFL under this subcontract."

On September 28, 1967 (Ex. 46) ITT again offered $40,000 in settlement of all of Undersea's claims separate and apart from the fixed-price portion of the subcontract, and offered an additional $5,000 to settle the fixed-price portion, stating: "Have in hand check payable to UEC for $45,000 in total settlement of all UEC claims for all amounts due under SK-714559. * * * Can mail check upon receipt of written acceptance of this offer which shall state that 'ITTFL is released from any and all claims in connection with the subcontract.'" Undersea cabled as follows (Ex. 48): "We accept your offer ITTFL is released from any and all claims in connection with the subcontract", and by letter of October 3, 1967 (Ex. 50) wrote that Undersea "hereby releases ITTFL from any and all claims in connection with ITTFL subcontract No. SK-714559, upon receipt of $45,000.00 as outlined in your TWX dated September 28, 1967."

By letter of October 5, 1967 (Ex. 51) ITT wrote Undersea enclosing the check and stating: "We have enclosed our check in the amount of $45,000.00 payable to UEC in recognition of our settlement of all claims of whatsoever nature that have any connection with ITTFL

subcontract No. SK-714559", and on the back of the settlement check (Ex. 52) and above the endorsement of Undersea thereon was stated: "This check represents final payment under subcontract No. SK-714559 pursuant to a settlement by which UEC has released ITTFL from any and all further liability."

■■ The above recited facts are uncontested and undenied by Undersea, and Undersea has offered no facts (as distinguished from assertions) in contradiction thereof. Under Rule 56 F.R. Civ.P., this court can and does therefore accept them as true. The terms of the general release are definite and certain and the release forecloses Undersea from asserting its contract (Counts I and II), quasi-contract (Count V) and tort (Count III) claims against ITT, because each of Undersea's claims now sued upon springs from, and arises out of and in connection with, the subcontract, and involves unliquidated claims asserted against ITT and disputed by ITT which arose prior to the execution of the releases. The releases are so unambiguous that it is not necessary for this court to resort to any extrinsic evidence in order to determine the scope of these releases. On the face of the releases, therefore, Undersea has no legal basis for the suit it has filed.

Undersea maintains however that the releases are voidable because it executed the releases only under the economic coercion of ITT, maintaining that ITT pursued a deliberate course of withholding payments due Undersea under the subcontract, thereby placing Undersea in a state of bankruptcy as of August 1967, and that ITT took advantage of Undersea's financial distress by offering only $45,000 in settlement. Bypassing for the moment the impact of the undisputed facts, setting forth clearly the history of the events leading up to the settlement and showing without question that Undersea was using every threat of economic and moral pressure to coerce and force ITT to settle rather than face a law suit with threatened world-wide pub-

licity engendered by Undersea, Undersea's claim of economic coercion is not well founded as a matter of law.

■■ Just as in W. R. Grimshaw Co. v. Nevil C. Withrow Co., 248 F.2d 896, 902–904 (8 Cir. 1957), in order to establish its claim of economic duress in the face of the motion for summary judgment, the plaintiff here must present *facts* which show (1) that it involuntarily accepted ITT's terms, (2) that circumstances permitted no other alternative, and (3) that the circumstances were the result of the coercive acts of ITT. No such *facts* have been set out by Undersea, neither by affidavit nor exhibits. There is no fact apparent to this court which indicates that Undersea entered involuntarily into the settlement. Undersea's vice-president, Glickman, was the prime mover in instituting the negotiations from which the settlement resulted. The negotiations extended over a period of almost six months. As early as June 1966 Undersea threatened and could have filed suit but instead, chose to pursue the avenue of settlement. Duress requires, however, that the execution of the agreement sought to be avoided was the only choice reasonably available to the party challenging it. Where, as is manifest here, the avenue of litigation is *open* to the challenging party but he chooses not to pursue it, it cannot be said that the subsequent settlement was a product of duress.[2]

■ The basic premise of counsel for Undersea in his cited law and argument has been that the relative financial positions of the parties, viz., that ITT was a "multi-billion corporate giant" (an elephant), while Undersea was capitalized at but $25,000 when it undertook the contract (an ant), makes out a *prima facie* or *per se* showing of economic coercion (because of the overwhelming disparity in size of the two parties, and ITT's superior economic position better enabled it to resist the demands of Undersea). Unfortunately for plaintiffs' position, this is not the law on economic coercion.

ITT cannot be held responsible for the amount of Undersea's capitalization, nor is it sufficient for Undersea simply to plead that the elephant's refusal to pay the claims of the ant was wrongful or coercive conduct, *per se* making the former responsible for the latter's financial circumstances. Even if we assume that the acceptance of ITT's settlement offer was motivated by impending bankruptcy, economic duress is not thereby established.

"In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities.[3]

The claims made by Undersea were all matters which had been in dispute for months, as were the counterclaims asserted by ITT. The claims and counterclaims were all unliquidated and therefore, perforce, were subject to negotiation between the parties. The claims advanced by Undersea arose out of circumstances which could not have been known to ITT at the time it submitted its prime contract bid (even if, as argued by Undersea, ITT had deliberately underbid the prime contract it had with the U. S. Navy with any secret intention that Undersea might conjure up), e. g., delay in the arrival of the "Giant", questions relating to the interpretation of the subcontract, damage to a vessel moor con-

2. Joyce v. Year Investments, Inc., 45 Ill. App.2d 310, 196 N.E.2d 24 (1964).

3. W. R. Grimshaw Co. v. Nevil C. Withrow Co., *supra*, at 904. See also, Fabert Motors, Inc. v. Ford Motor Company, 355 F.2d 888, 890–891 (7 Cir. 1966) ; California Concrete Pipe Co. v. American Pipe & Construction Company et al. (D.Haw. 1968). *Cf.* Carter v. Twentieth Century-Fox Film Corporation, 127 F.Supp. 675 (W.D.Mo.1955).

structed by Undersea, and questions arising out of the renegotiation of the fixed-price portion of the subcontract. Likewise, Undersea's claim that a lone employee of ITT, at some undisclosed time long prior to the settlement, stated that it (ITT) would break Undersea financially, is without weight in the context of Undersea's instant claim of economic duress.[4]

The undisputed facts herein show that the making of the settlement agreement by Undersea was voluntary as a matter of law. It was made by Undersea as an alternative to the filing of suit and it was not made as a result of any wrongful or deliberately coercive conduct on the part of ITT amounting to economic duress. Under the undisputed facts in this case, this court may by summary judgment dispose of a claim for relief from a release based upon Undersea's claim in avoidance of economic duress.[5]

The undisputed facts in this case mandate the conclusion that the release given by Undersea to ITT is not invalid as being a product of economic coercion. The release and agreement of compromise in settlement is therefore binding on the parties thereto. The claims now asserted by Undersea in this law suit are each and all encompassed within the purview of the release and Undersea's claims are barred thereby.

There still remains to be disposed of, however, the claim of Undersea against Healy-Tibbitts. Inasmuch as Undersea's allegation is that ITT and Healy-Tibbitts acted as joint tort feasors in destroying the four-point vessel moor constructed by Undersea, and Undersea has by its prayer postured this case as founded in admiralty,[6] this court could but simply apply the federal rule that the release of one of several joint tort feasors without specifically naming in the release the other joint tort feasors not intended to be released thereby, has the effect of releasing all joint tort feasors not so excluded,[7] and on that basis dismiss the Healy-Tibbitts claim.

However, it is undisputed that Undersea was paid the full subcontract price of $28,000 for its work done on the vessel moor and although subsequently ITT discovered that the damage done to the moor by the Healy-Tibbitts barge was the result of faulty construction of the moor by Undersea and not attributable to Healy-Tibbitts, ITT thereafter replaced the entire mooring structure at its own cost and expense (Ex. 35 and 36). It is manifest, therefore, that Undersea has suffered no damage. On either or both bases, therefore, the Undersea claim against Healy-Tibbitts is without legal or factual support and must be dismissed.

Last to be considered is the Shelton quasi-contract claim, Count IV of the complaint. Therein Shelton realleges the ITT-Undersea subcontract with Shelton as a sub-subcontractor under Undersea. Then Shelton pleads that relying upon the contract between ITT and Undersea by which ITT was obligated to

4. Alloy Products Corp. v. United States, 302 F.2d 528, 530–531, 157 Ct.Cl. 376 (1962).

5. Williamson v. Bendix Corporation, 289 F.2d 389, 392–393 (7 Cir. 1961); Suckow Borax Mines Consol. v. Borax Consolidated Ltd., 185 F.2d 196 (9 Cir. 1950), cert. denied 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951); California Concrete Pipe Co. v. American Pipe & Construction Company, *supra.*

6. "WHEREFORE, Libellants pray: 1. That process in due form of law, according to the course and practice of this Honorable Court in causes of admiralty and maritime jurisdiction, may issue against the Respondents. * * *" (Complaint, p. 9).

Plaintiffs' statement as to the basis of this court's jurisdiction is, of course, not binding upon the court. By the preceding reference to plaintiffs' complaint, it must not be assumed that this court agrees that this case is properly laid in admiralty. The court has jurisdiction under the diversity aspects of this case.

7. Twentieth Century-Fox F. Corp. v. Winchester Drive-In Th., 351 F.2d 925 (9 Cir. 1965), cert. denied 382 U.S. 1101, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966); California Concrete Pipe Co. v. American Pipe & Construction Company, *supra.*

pay for the labor, materials, etc., "furnished and performed * * * by Undersea, Shelton did furnish work, labor and services, materials, supplies and equipment and advanced money to Undersea in connection with the said subcontract to the value of $88,290.15." Shelton continues to plead that because ITT was paid by the U. S. Navy its full contract price which included the work done for Undersea by Shelton and did not thereafter pay the "sums due under the said subcontract with Undersea", ITT was unjustly enriched and should be declared to be the constructive trustee, in favor of Shelton, of the $88,290.15. Shelton's theory of recovery blithely bypasses the admitted fact of payment by ITT to Undersea of a total of about $247,000 because of the subcontract. Presumptively, Shelton's $88,290.15 claim was for work done by it for which Undersea collected from ITT, and Shelton does not negate that presumption.

 Moreover, however, in the absence of legislation specifically permitting the same,[8] a sub-subcontractor who is not paid by the subcontractor for whom the "sub-sub" has, under contract, rendered work and labor has no claim in quasi-contract, or equity against the prime contractor with whom the "sub-sub" had no contractual dealings whatsoever. There is no allegation of any privity here between ITT and Shelton, and as stated in plaintiffs' complaint, the work Shelton did was done under its express (sub) contract with Undersea, thus negating any implied contract with ITT based on any benefits ITT may have received. Where work and labor is performed under a contract, suit must be between parties to the contract, and third-persons although benefited by the work cannot be sued on an implied assumpsit to pay for that benefit.[9] Shelton, therefore, has set forth no

valid claim against ITT. Its claim, if any, is against Undersea.

Defendants' motion for summary judgment is in all particulars granted.

The release agreement entered into between Undersea and ITT was intended to be a complete release of all claims and counterclaims of the parties. The court, having held that release to be valid, defendants' counterclaims must be dismissed, and it is so ordered.

Let judgment be entered in accord with these rulings.

Dated: Honolulu Hawaii, this 26th day of August, 1968.

Martin Pence
United States District Judge

Filed in the United States District Court, District of Hawaii, August 26, 1968, at 11 o'clock and 5 minutes A.M.

A. Y. H. Chinn, Clerk,

By Ione Akana, Deputy.

---

8. *Cf.* "Miller Act", 40 U.S.C. § 270b; Mechanic's Lien Law, RLH 1955, C. 193, part II.

9. Tropic Builders, Ltd. v. Naval Ammunition Depot, 48 Haw. 306, 323–324, 402 P.2d 440, 450–451 (1965); Utschig v. McClone, 16 Wis.2d 506, 114 N.W.2d 854 (1962).