**TOTEM MARINE TUG & BARGE, INC., an Alaskan Corporation, Pacific, Inc., an Alaska Corporation, and Richard Stair, an Individual, Appellants,**

v.

**ALYESKA PIPELINE SERVICE COMPANY, a corporation, et al., Appellees.**

**No. 3288.**

Supreme Court of Alaska.

Aug. 25, 1978.

---

Edgar Paul Boyko, Edgar Paul Boyko & Associates, P. C., Anchorage, Robert K. Schraner, San Diego, Cal., for appellants.

Allen McGrath, Graham & James, Anchorage, for appellees.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

BURKE, Justice.

This appeal arises from the superior court's granting of summary judgment in favor of defendants-appellees Alyeska Pipeline Services, et al., in a contract action brought by plaintiffs-appellants Totem Marine Tug & Barge, Inc., Pacific, Inc., and Richard Stair.

The following summary of events is derived from the materials submitted in the summary judgment proceedings below.

Totem is a closely held Alaska corporation which began operations in March of 1975. Richard Stair, at all times relevant to this case, was vice-president of Totem. In June of 1975, Totem entered into a contract with Alyeska under which Totem was to transport pipeline construction materials from Houston, Texas, to a designated port in southern Alaska, with the possibility of one or two cargo stops along the way. In order to carry out this contract, which was Totem's first, Totem chartered a barge (The "Marine Flasher") and an ocean-going tug (the "Kirt Chouest"). These charters and

other initial operations costs were made possible by loans to Totem from Richard Stair individually and Pacific, Inc., a corporation of which Stair was principal stockholder and officer, as well as by guarantees by Stair and Pacific.

By the terms of the contract, Totem was to have completed performance by approximately August 15, 1975. From the start, however, there were numerous problems which impeded Totem's performance of the contract. For example, according to Totem, Alyeska represented that approximately 1,800 to 2,100 tons of regular uncoated pipe were to be loaded in Houston, and that perhaps another 6,000 or 7,000 tons of materials would be put on the barge at later stops along the west coast. Upon the arrival of the tug and barge in Houston, however, Totem found that about 6,700 to 7,200 tons of coated pipe, steel beams and valves, haphazardly and improperly piled, were in the yard to be loaded. This situation called for remodeling of the barge and extra cranes and stevedores, and resulted in the loading taking thirty days rather than the three days which Totem had anticipated it would take to load 2,000 tons. The lengthy loading period was also caused in part by Alyeska's delay in assuring Totem that it would pay for the additional expenses, bad weather and other administrative problems.

The difficulties continued after the tug and barge left Houston. It soon became apparent that the vessels were travelling more slowly than anticipated because of the extra load. In response to Alyeska's complaints and with its verbal consent, on August 13, 1975, Totem chartered a second tug, the "N. Joseph Guidry." When the "Guidry" reached the Panama Canal, however, Alyeska had not yet furnished the written amendment to the parties' contract. Afraid that Alyeska would not agree to cover the cost of the second tug, Stair notified the "Guidry" not to go through the Canal. After some discussions in which Alyeska complained of the delays and accused Totem of lying about the horsepower of the first tug, Alyeska executed the amendment on August 21, 1975.

By this time the "Guidry" had lost its preferred passage through the Canal and had to wait two or three additional days before it could go through. Upon finally meeting, the three vessels encountered the tail of a hurricane which lasted for about eight or nine days and which substantially impeded their progress.

The three vessels finally arrived in the vicinity of San Pedro, California, where Totem planned to change crews and refuel. On Alyeska's orders, however, the vessels instead pulled into port at Long Beach, California. At this point, Alyeska's agents commenced off-loading the barge, without Totem's consent, without the necessary load survey, and without a marine survey, the absence of which voided Totem's insurance. After much wrangling and some concessions by Alyeska, the freight was off-loaded. Thereafter, on or about September 14, 1975, Alyeska terminated the contract. Although there was talk by an Alyeska official of reinstating the contract, the termination was affirmed a few days later at a meeting at which Alyeska officials refused to give a reason for the termination.

Following termination of the contract, Totem submitted termination invoices to Alyeska and began pressing the latter for payment. The invoices came to something between $260,000 and $300,000. An official from Alyeska told Totem that they would look over the invoices but that they were not sure when payment would be made—perhaps in a day or perhaps in six to eight months. Totem was in urgent need of cash as the invoices represented debts which the company had incurred on 10–30 day payment schedules. Totem's creditors were demanding payment and according to Stair, without immediate cash, Totem would go bankrupt. Totem then turned over the collection to its attorney, Roy Bell, directing him to advise Alyeska of Totem's financial straits. Thereafter, Bell met with Alyeska officials in Seattle, and after some negotiations, Totem received a settlement offer from Alyeska for $97,500. On November 6, 1975, Totem, through its president Stair,

signed an agreement releasing Alyeska from all claims by Totem in exchange for $97,500.

On March 26, 1976, Totem, Richard Stair, and Pacific filed a complaint against Alyeska, which was subsequently amended. In the amended complaint, the plaintiffs sought to rescind the settlement and release on the ground of economic duress and to recover the balance allegedly due on the original contract. In addition, they alleged that Alyeska had wrongfully terminated the contract and sought miscellaneous other compensatory and punitive damages.

Before filing an answer, Alyeska moved for summary judgment against the plaintiffs on the ground that Totem had executed a binding release of all claims against Alyeska and that as a matter of law, Totem could not prevail on its claim of economic duress. In opposition, plaintiffs contended that the purported release was executed under duress in that Alyeska wrongfully terminated · the contract; that Alyeska knew that Totem was faced with large debts and impending bankruptcy; that Alyeska withheld funds admittedly owed knowing the effect this would have on plaintiffs and that plaintiffs had no alternative but to involuntarily accept the $97,500 in order to avoid bankruptcy. Plaintiffs

maintained that they had thus raised genuine issues of material fact such that trial was necessary, and that Alyeska was not entitled to judgment as a matter of law. Alyeska disputed the plaintiffs' assertions.

On November 30, 1976, the superior court granted the defendant's motion for summary judgment. This appeal followed.

I

At the outset, this case presents a procedural issue which we must resolve before reaching the major questions on appeal.

■ Where a party to an action has filed a motion for summary judgment, pursuant to Rule 56, Alaska R.Civ.P., the trial court's initial task is to determine whether there exist genuine issues of material fact such that trial on these issues is necessary. Ordinarily, the parties submit affidavits, depositions, sworn admissions, answers to interrogatories or similar material in order to show the existence or non-existence of those facts material to the case. Civil Rule 56(c) and (e);[1] see 10 C. Wright and A. Miller, *Federal Practice and Procedure: Civil*, § 2721 at 475–76 (1973). On the basis of these materials together with the pleadings, the trial court then decides whether genuine issues of material fact exist. If

1. Civil Rule 56(c) and (e) provides:

(c) *Motion and Proceedings Thereon.* The motion shall be made pursuant to Rule 77, and may be supported by affidavits setting forth concise statements of material facts made upon personal knowledge. There must also be served and filed with each motion a memorandum showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The adverse party in accordance with Rule 77 may serve opposing affidavits, a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, and any other memorandum in opposition to the motion. Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the

amount of damages. Summary judgment, when appropriate, may be rendered against the moving party.

.     .     .     .     .

(e) *Form of Affidavits—Further Testimony— Defense Required.* Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

such issues do exist, summary judgment is denied; if not, the court enters judgment for the party prevailing as a matter of law. Civil Rule 56(c).

In the instant case, most of the facts bearing on summary judgment were contained in a deposition taken by Alyeska of appellant Richard Stair. With the exception of Alyeska's submission of the release executed by Totem, both Alyeska's motion for summary judgment and Totem's opposing memorandum and statement of genuine issues were based almost solely on testimony contained in the *Stair* deposition. The memoranda of both parties included numerous references to and quoted excerpts from the deposition.

▋ Following entry of summary judgment in Alyeska's favor and commencement of this appeal by Totem, Totem submitted a motion to the superior court requesting it to publish Stair's deposition[2] so that it could become part of the record on appeal. Despite the extensive use of this deposition, it apparently had not been formally opened and presented to the court during the proceedings below. The superior court denied the motion on the ground that the deposition was not before it during the proceedings and thus was not part of the record before the court.

Thereafter, Alyeska filed a motion in this court to strike portions of Totem's reply brief for the reason that these portions contained references to the *Stair* deposition which were not before the superior court. Specifically, Alyeska sought to strike all references to those parts of the deposition to which reference had not been made in the memoranda filed below. We denied the motion.

We believe that the lower court erred in refusing to publish the *Stair* deposition and in ruling that the deposition was not part of the record before it. In *Jennings v. State,* 566 P.2d 1304 (Alaska 1977), the trial court had ruled on a motion for summary judgment by referring only to the pleadings.

We concluded that this was error and stated:

> Even though the parties did little to call the superior court's attention to other items, including the three depositions on file, the superior court should have gone outside the pleadings to consider the entire setting of the case to the extent that the material was brought to the court's attention by the parties on the motion.

566 P.2d at 1310 [footnote omitted]. In that case, we then looked to the depositions to determine what facts the superior court would have found had it looked outside the pleadings. *Id.*

In the instant case, unlike *Jennings,* the parties did refer frequently to the *Stair* deposition in the court below. Although Totem did not move formally to publish the deposition at the time of the hearing, we think the superior court was obliged to consider, on its own motion, at least those portions of the deposition to which reference was made in the memoranda and arguments of the parties. Therefore, we consider the deposition to be properly part of the record on appeal. Ordinarily, we would remand this case to the superior court for a new decision on Alyeska's motion for summary judgment, at which time it could take into consideration the facts found in the deposition. However, we have elected to examine the pertinent portions of the deposition for ourselves, in order to avoid further delay in the ultimate resolution of this case.

## II

As was noted above, a court's initial task in deciding motions for summary judgment is to determine whether there exist genuine issues of material fact. In order to decide whether such issues exist in this case, we must examine the doctrine allowing avoidance of a release on grounds of economic duress.

---

2. In its motion, Totem also requested publication of the deposition of Truman Cooke. On appeal, neither Totem nor Alyeska has made reference to the facts contained in Cooke's deposition and thus we have not considered it on review.

This court has not yet decided a case involving a claim of economic duress or what is also called business compulsion. At early common law, a contract could be avoided on the ground of duress only if a party could show that the agreement was entered into for fear of loss of life or limb, mayhem or imprisonment. 13 *Williston on Contracts,* § 1601 at 649 (3d ed. Jaeger 1970). The threat had to be such as to overcome the will of a person of ordinary firmness and courage. *Id.,* § 1602 at 656. Subsequently, however, the concept has been broadened to include myriad forms of economic coercion which force a person to involuntarily enter into a particular transaction. The test has come to be whether the will of the person induced by the threat was overcome rather than that of a reasonably firm person. *Id.,* § 1602 at 657.

At the outset it is helpful to acknowledge the various policy considerations which are involved in cases involving economic duress. Typically, those claiming such coercion are attempting to avoid the consequences of a modification of an original contract or of a settlement and release agreement. On the one hand, courts are reluctant to set aside agreements because of the notion of freedom of contract and because of the desirability of having private dispute resolutions be final. On the other hand, there is an increasing recognition of the law's role in correcting inequitable or unequal exchanges between parties of disproportionate bargaining power and a greater willingness to not enforce agreements which were entered into under coercive circumstances.[3]

There are various statements of what constitutes economic duress, but as noted by one commentator, "The history of generalization in this field offers no great encouragement for those who seek to summarize results in any single formula." Dawson, *Economic Duress—An Essay in Perspective,* 45 Mich.L.Rev. 253, 289 (1947). Section 492(b) of the *Restatement of Contracts* defines duress as:

any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement.

Professor Williston states the basic elements of economic duress in the following manner:

1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and

2. Such act or threat must be one which deprives the victim of his unfettered will.

13 *Williston on Contracts,* § 1617 at 704 [footnotes omitted].

Many courts state the test somewhat differently, eliminating use of the vague term "free will," but retaining the same basic idea. Under this standard, duress exists where: (1) one party involuntarily accepted the terms of another, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party. *Undersea Engineering & Construction Co. v. International Telephone & Telegraph Corp.,* 429 F.2d 543, 550 (9th Cir. 1970); *Urban Plumbing and Heating Co. v. United States,* 408 F.2d 382, 389, 187 Ct.Cl. 15 (1969); *W. R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir. 1957); *Fruhauf Southwest Garment Co. v. United States,* 111 F.Supp. 945, 951, 126 Ct.Cl. 51 (1953). The third element is further explained as follows:

In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by the plaintiff's necessities.

3. *See Witt v. Watkins,* 579 P.2d 1065 (Alaska 1978), for similar considerations involved in a suit seeking to void a release in a personal injury case.

*W. R. Grimshaw Co., supra*, 111 F.Supp. at 904.

As the above indicates, one essential element of economic duress is that the plaintiff show that the other party by wrongful acts or threats, intentionally caused him to involuntarily enter into a particular transaction. Courts have not attempted to define exactly what constitutes a wrongful or coercive act, as wrongfulness depends on the particular facts in each case. This requirement may be satisfied where the alleged wrongdoer's conduct is criminal or tortious but an act or threat may also be considered wrongful if it is wrongful in the moral sense. *Restatement of Contracts*, § 492, comment (g); *Gerber v. First National Bank of Lincolnwood*, 30 Ill.App.3d 776, 332 N.E.2d 615, 618 (1975); *Fowler v. Mumford*, 48 Del. 282, 9 Terry 282, 102 A.2d 535, 538 (Del.Supr.1954).

In many cases, a threat to breach a contract or to withhold payment of an admitted debt has constituted a wrongful act. *Hartsville Oil Mill v. United States*, 271 U.S. 43, 49, 46 S.Ct. 389, 391, 70 L.Ed. 822, 827 (1926); *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533, 535 (1971); *Capps v. Georgia-Pacific Corporation*, 253 Or. 248, 453 P.2d 935 (1969); *see also* 13 *Williston, supra*, § 1616A at 701. Implicit in such cases is the additional requirement that the threat to breach the contract or withhold payment be done in bad faith. *See Louisville Title Insurance Co. v. Surety Title & Guaranty Co.*, 60 Cal.App.3d 781, 132 Cal.Rptr. 63, 76, 79 (1976); *Restatement (Second) of Contracts*, § 318 comment (e).

Economic duress does not exist, however, merely because a person has been the victim of a wrongful act; in addition, the victim must have no choice but to agree to the other party's terms or face serious financial hardship. Thus, in order to avoid a contract, a party must also show that he had no reasonable alternative to agreeing to the other party's terms, or, as it is often stated, that he had no adequate remedy if the threat were to be carried out. *First National Bank of Cincinnati v. Pepper*, 454

F.2d 626, 632–33 (2d Cir. 1972); *Austin Instrument, supra*, 324 N.Y.S.2d at 25, 272 N.E.2d at 535; *Capps, supra; Ross Systems v. Linden Dari-Delite, Inc.*, 35 N.J. 329, 173 A.2d 258, 261 (1961); *Leeper v. Beltrami*, 53 Cal.2d 195, 1 Cal.Rptr. 12, 19, 347 P.2d 12, 19 (1959); *Tri-State Roofing Company of Uniontown v. Simon*, 187 Pa.Super. 17, 142 A.2d 333, 335–36 (1958). What constitutes a reasonable alternative is a question of fact, depending on the circumstances of each case. An available legal remedy, such as an action for breach of contract, may provide such an alternative. *First National Bank of Cincinnati, supra; Austin Instrument, supra; Tri-State Roofing, supra.* Where one party wrongfully threatens to withhold goods, services or money from another unless certain demands are met, the availability on the market of similar goods and services or of other sources of funds may also provide an alternative to succumbing to the coercing party's demands. *Austin Instrument, supra; Tri-State Roofing, supra.* Generally, it has been said that "[t]he adequacy of the remedy is to be tested by a practical standard which takes into consideration the exigencies of the situation in which the alleged victim finds himself." *Ross Systems*, 173 A.2d at 262. *See also First National Bank of Cincinnati, supra* at 634; Dalzell, *Duress By Economic Pressure I*, 20 N. Carolina L.Rev. 237, 240 (1942).

An available alternative or remedy may not be adequate where the delay involved in pursuing that remedy would cause immediate and irreparable loss to one's economic or business interest. For example, in *Austin Instrument, supra*, and *Gallagher Switchboard Corp. v. Heckler Electric Co.*, 36 Misc.2d 225, 232 N.Y.S.2d 590 (N.Y.Sup. Ct.1962), duress was found in the following circumstances: A subcontractor threatened to refuse further delivery under a contract unless the contractor agreed to modify the existing contract between the parties. The contractor was unable to obtain the necessary materials elsewhere without delay, and if it did not have the materials promptly, it would have been in default on its main

contract with the government. In each case such default would have had grave economic consequences for the contractor and hence it agreed to the modifications. In both, the courts found that the alternatives to agreeing to the modification were inadequate (*i. e.,* suing for breach of contract or obtaining the materials elsewhere) and that modifications therefore were signed under duress and voidable.

Professor Dalzell, in *Duress By Economic Pressure II,* 20 N. Carolina L.Rev. 340, 370 (1942), notes the following with regard to the adequacy of legal remedies where one party refuses to pay a contract claim:

> Nowadays, a wait of even a few weeks in collecting on a contract claim is sometimes serious or fatal for an enterprise at a crisis in its history. The business of a creditor in financial straits is at the mercy of an unscrupulous debtor, who need only suggest that if the creditor does not care to settle on the debtor's own hard terms, he can sue. This situation, in which promptness in payment is vastly more important than even approximate justice in the settlement terms, is too common in modern business relations to be ignored by society and the courts.

This view finds support in *Capps v. Georgia Pacific Corporation,* 253 Or. 248, 453 P.2d 935 (1969). There, the plaintiff was owed $157,000 as a commission for finding a lessee for defendant's property but in exchange for $5,000, the plaintiff signed a release of his claim against defendant. The plaintiff sued for the balance of the commission, alleging that the release had been executed under duress. His complaint, however, was dismissed. On appeal, the court held that the plaintiff had stated a claim where he alleged that he had accepted the grossly inadequate sum because he was in danger of immediately losing his home by mortgage foreclosure and other property by foreclosure and repossession if he did not obtain immediate funds from the defendant. One basis for its holding was found in the following quote by a leading commentator in the area of economic duress:

> The most that can be claimed [regarding the law of economic duress] is that change has been broadly toward acceptance of a general conclusion—that in the absence of specific countervailing factors of policy or administrative feasibility, restitution is required of any excessive gain that results, in a bargain transaction, from impaired bargaining power, whether the impairment consists of economic necessity, mental or physical disability, or a wide disparity in knowledge or experience.

Dawson, *Economic Duress—An Essay In Perspective,* 45 Mich.L.Rev. 253, 289 (1947).[4]

### III

Turning to the instant case, we believe that Totem's allegations, if proved, would support a finding that it executed a release of its contract claims against Alyeska under economic duress. Totem has alleged that

---

4. This court expressed a similar view in *Inman v. Clyde Hall Drilling Company,* 369 P.2d 498, 500 (Alaska 1962). In response to a claim that a contract provision was unconscionable, it was said:

> In the absence of a constitutional provision or statute which makes certain contracts illegal or unenforceable, we believe it is the function of the judiciary to allow men to manage their own affairs in their own way. As a matter of judicial policy the court should maintain and enforce contracts, rather than enable parties to escape from the obligations they have chosen to incur.
>
> We recognize that 'freedom of contract' is a qualified and not an absolute right, and cannot be applied on a strict, doctrinal basis. An established principle is that a court will

not permit itself to be used as an instrument of inequity and injustice. . . . In determining whether certain contractual provisions should be enforced, the court must look realistically at the relative bargaining positions of the parties in the framework of contemporary business practices and commercial life. If we find those positions are such that one party has unscrupulously taken advantage of the economic necessities of the other, then in the interest of justice—as a matter of public policy—we would refuse to enforce the transaction. But the grounds for judicial interference must be clear. Whether the court should refuse to recognize and uphold that which the parties have agreed upon is a question of fact upon which evidence is required. [footnotes omitted].

Alyeska deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt; that Totem was faced with impending bankruptcy; that Totem was unable to meet its pressing debts other than by accepting the immediate cash payment offered by Alyeska; and that through necessity, Totem thus involuntarily accepted an inadequate settlement offer from Alyeska and executed a release of all claims under the contract. If the release was in fact executed under these circumstances,[5] we think that under the legal principles discussed above that this would constitute the type of wrongful conduct and lack of alternatives that would render the release voidable by Totem on the ground of economic duress. We would add that although Totem need not necessarily prove its allegation that Alyeska's termination of the contract was wrongful in order to sustain a claim of economic duress, the events leading to the termination would be probative as to whether Alyeska exerted any wrongful pressure on Totem and whether Alyeska wrongfully withheld payment from Totem.[6]

One purpose of summary judgment, however, is to pierce the allegations in the pleadings in an effort to determine whether genuine issues of fact exist. As the moving party, Alyeska had the burden of showing that there were no such genuine issues and that it was entitled to judgment as a matter of law. *E. g., Brock v. Rogers and Babler, Inc.,* 536 P.2d 778, 782 (Alaska 1975). Alyeska showed that Totem had executed the release, that Totem had been represented by counsel at the negotiating session leading to the settlement and release and that appellant Stair, who actually signed the release on behalf of Totem, was fully aware of the consequences of such a release. Such evidence, by itself, would have entitled Alyeska to summary judgment in its favor. As a matter of law, there is no doubt that a valid release of all claims arising under a contract will bar any subsequent claims based on that contract.

To avoid summary judgment once the moving party meets its burden, the non-moving party must produce competent evidence showing that there are issues of material fact to be tried. *Id.* The respondent must set forth specific facts showing that it could produce admissible evidence reasonably tending to dispute the movants evidence or establish an affirmative defense. *Id.* The court then must draw all reasonable inferences in favor of the non-moving party and against the movant. *E. g., Clabaugh v. Bottcher,* 545 P.2d 172, 175 n.5 (Alaska 1976).

In entering summary judgment against Totem, the court below reasoned as follows:

The plaintiffs, specifically Mr. Stair, assert the release and settlement should be held for naught because of duress and coercion exerted upon him and his corporation by the defendants' action.

Mr. Stair fails to show that the release and settlement negotiated by his attorneys was involuntary on his part. Mr. Stair did not personally participate in the negotiations which resulted in the release and settlement. No affidavit or other suggestion of evidence has been submitted to demonstrate that upon trial the plaintiffs could sustain their burden of proof required to set aside the release and settlement.

As thus stated, the superior court's decision clearly misstated the standard applicable on motions for summary judgment. A party opposing summary judgment need not establish that he will ultimately prevail at trial. *Gablick v. Wolfe,* 469 P.2d 391, 395 (Alaska 1970). Although we may affirm a

---

5. By way of clarification, we would note that Totem would not have to prove that Alyeska admitted to owing the precise sum Totem claimed it was owed upon termination of the contract but only that Alyeska acknowledged that it owed Totem approximately that amount which Totem sought.

6. We make no comment as to whether Alyeska's termination of the contract was wrongful nor as to the truth of Totem's other allegations.

trial court's grant of summary judgment if alternative grounds exist for upholding its judgment, *Moore v. State*, 553 P.2d 8, 21 (Alaska 1976), we do not believe that summary judgment was properly granted in this case.

Our examination of the materials presented by Totem in opposition to Alyeska's motion for summary judgment leads us to conclude that Totem has made a sufficient factual showing as to each of the elements of economic duress to withstand that motion. There is no doubt that Alyeska disputes many of the factual allegations made by Totem [7] and drawing all inferences in favor of Totem, we believe that genuine issues of material fact exist in this case such that trial is necessary. Admittedly, Totem's showing was somewhat weak in that, for example, it did not produce the testimony of Roy Bell, the attorney who represented Totem in the negotiations leading to the settlement and release. At trial, it will probably be necessary for Totem to produce this evidence if it is to prevail on its claim of duress. However, a party opposing a motion for summary judgment need not produce all of the evidence it may have at its disposal but need only show that issues of material fact exist. 10 C. Wright and A. Miller, *Federal Practice and Procedure: Civil*, § 2727 at 546 (1973). Therefore, we hold that the superior court erred in granting summary judgment for appellees and remand the case to the superior court for trial in accordance with the legal principles set forth above.

## IV

One final issue remains in this appeal. Appellants Richard Stair and Pacific, Inc. contend that even if Totem is ultimately found to be bound by the release it executed, Stair and Pacific are not similarly bound because they did not sign the release. This contention is without merit. Neither Stair individually nor Pacific were parties to the original contract between Totem and Alyeska, nor were they parties to the amendment. No contention has been made that they were even third party beneficiaries to that contract. As they were not parties to the original contract, it follows that Stair and Pacific had no contractual claims against Alyeska which they could have released and thus it is irrelevant whether or not they executed the release. Stair and Pacific's fate in this lawsuit, therefore, depends entirely on Totem's success or failure in pursuing its contractual claims against Alyeska.

REVERSED and REMANDED.

---

7. For example, Alyeska has denied that it ever admitted to owing any particular sum to Totem and has disputed the truthfulness of Totem's assertions of impending bankruptcy. Other factual issues which remain unresolved include whether or not Alyeska knew of Totem's financial situation after termination of the contract and whether Alyeska did in fact threaten by words or conduct to withhold payment unless Totem agreed to settle.