**NORTHERN FABRICATION COMPANY, INC., Appellant,**

v.

**UNOCAL and Star North Services, Appellees.**

**No. S–8595.**

Supreme Court of Alaska.

May 28, 1999.

C.R. Kennelly, Stepovich, Kennelly & Stepovich, P.C., Anchorage, for Appellant.

Arden E. Page and Michael W. Seville, Burr, Pease & Kurtz, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

PER CURIAM.

We agree with the decision entered in this case by Superior Court Judge Peter A. Michalski. We thus AFFIRM that decision for the reasons expressed in Judge Michalski's

1. The decision has been edited in conformity

Memorandum and Order, attached hereto as an Appendix.[1]

APPENDIX

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

Northern Fabrication Co., Inc., Plaintiff,

v.

Union Oil Company of California, d/b/a Unocal,Inc., and Star North Services, Inc., Defendants.

Case No. 3AN–95–3864 CI

*MEMORANDUM AND ORDER*

Defendants Union Oil Company of California and Star North Services, Inc. (UNOCAL) moved for summary judgment against plaintiff Northern Fabrication Co., Inc. (NFC) on the grounds that NFC had previously accepted an offer of compromise and signed a release of all claims. NFC opposes the motion by asserting that the release was obtained by economic duress.

I. *STANDARD OF REVIEW*

This case is before the court on a motion for summary judgment pursuant to Alaska Rule of Civil Procedure 56. The rule provides that

[j]udgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.

Alaska R. Civ. P. 56(c). It is the proponent of the motion who must show that there is no genuine issue of material fact. *See Gudenau & Co. v. Sweeney Ins., Inc.*, 736 P.2d 763, 765 (Alaska 1987). "A material issue of fact exists where reasonable jurors could disagree in the resolution of factual issues presented

with Supreme Court procedural standards.

by the moving papers." *Hayes v. Xerox Corp.*, 718 P.2d 929, 936 (Alaska 1986).

## II. *STATEMENT OF FACTS*

In 1993, NFC successfully bid for UNO-CAL's Chakachatna Quarters Cantilever Structural Upgrade Project. The project called for the structural modification of three offshore drilling platforms, the Anna, the Bruce, and the Dillon. UNOCAL was to pay NFC approximately $90,000 for the specified modifications on each platform ($276,354 total). The contract called for the project to be completed by December 15, 1993. NFC had filed a Chapter 11 bankruptcy petition in 1991 but was reinstated to do business with UNOCAL. UNOCAL knew of NFC's bankruptcy history when NFC's bid was submitted.

NFC incurred significant cost overruns in its work on the first platform (the Bruce) and did not complete the work by the scheduled deadline. NFC attributed the problems that led to the overruns and delays to UNOCAL. NFC informed UNOCAL that the cost overrun on the Bruce platform was $110,060.54 and that it expected a cost overrun of an additional $61,915.61 on the work that was to be done on the Anna platform. UNOCAL offered to compromise with NFC by paying half of the $110,060.54 overrun. UNOCAL also terminated NFC's contract and hired another contractor to finish the work on the Anna and the Dillon as was its specific right under the contract.

After considering the offer for approximately six weeks, NFC accepted UNOCAL's settlement of $55,030.27 for the disputed cost overrun on the Bruce platform and signed a general release that purported to be a "complete compromise of matters involving disputed issues of law and fact." UNOCAL's Mem. at 3. NFC was represented by counsel during the entire process. Approximately fourteen months later, NFC filed a complaint seeking actual and punitive damages for UNOCAL's alleged breaches of contract, claiming that the release was void because it was signed under economic duress.

## III. *DISCUSSION*

NFC does not dispute that it signed the release. It does, however, attack the release's validity by alleging that it was obtained only by economic coercion and duress. According to NFC, UNOCAL exploited NFC's shaky financial position by offering only half of what it owed NFC at a time when it knew NFC could not afford any further delay in payment.

### A. *Case Law*

The law in Alaska on the invalidation of releases obtained through economic duress is found primarily in *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.*, 584 P.2d 15 (Alaska 1978), and *Zeilinger v. SOHIO Alaska Petroleum Co.*, 823 P.2d 653 (Alaska 1992). Both parties rely on the two cases.

Duress is said to exist where "(1) one party involuntarily accepted the terms of another, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party." *Zeilinger*, 823 P.2d at 657 (quoting *Totem*, 584 P.2d at 21). The *Zeilinger* court noted that the party opposing summary judgment "has to demonstrate a factual issue concerning each of the three prongs." *Id.* at 658; *see also Wassink v. Hawkins*, 763 P.2d 971, 974 (Alaska 1988) (failure to show factual dispute on third prong fatal to appeal from summary judgment on economic duress argument).

### B. *Application*

■ The first prong of the test appears almost meaningless in this context since the test of whether a party acted involuntarily is subjective. *See Helstrom v. North Slope Borough*, 797 P.2d 1192, 1197 (Alaska 1990). NFC's mere assertion that it acted involuntarily is sufficient to create the requisite factual dispute.

■ Next is the question of whether circumstances permitted any other alternative to accepting the offered amount and signing the release. Here, the test is objective. NFC asserts that it had no other alternative to signing the release and taking the offered

money because further delay would have meant sure bankruptcy for it and some of its creditors. Although one obvious alternative to signing the release would have been for NFC to sue for breach of contract, any remedy available through the courts would probably have come too late to prevent NFC's bankruptcy. NFC therefore raises at least a question of fact as to the feasibility of available alternatives when it asserts that it simply could not afford to wait.

■ "The third prong embodies two requirements: (a) coercive acts on the part of the other party and (b) a causal link between the coercive acts and the circumstances of economic duress." *Zeilinger*, 823 P.2d at 658. In *Helstrom*, the court noted that the "coercive acts" prong has been liberally construed, requiring that the strained circumstances be the result of acts which are criminal, tortious, or even merely "wrongful in the moral sense." *Helstrom*, 797 P.2d at 1198 (quoting *Totem*, 584 P.2d at 22). There is simply no evidence of any such coercive act on the part of UNOCAL.

NFC has not alleged nor brought forth evidence that UNOCAL threatened it or established any conditions to the settlement offer other than the legitimate and standard condition that NFC sign the release. UNOCAL had already terminated the contract with NFC and found another contractor to finish the work on the other two drilling platforms as the contract explicitly allowed. Therefore, UNOCAL could not have threatened NFC to sign the release or lose their right to continue with the project.

UNOCAL concedes that NFC was in dire economic straits. However, there is nothing in the record to suggest that UNOCAL exploited the situation in any way. *See Horgan v. Industrial Design Corp.*, 657 P.2d 751, 753–54 (Utah 1982) (economic necessity—very often the primary motivation for compromise—is not enough, by itself, to void an otherwise valid release). Clearly, the dispute with UNOCAL contributed to NFC's financial instability. However, without evidence that UNOCAL did anything "criminal, tortious or even merely 'wrongful in the moral

sense,'" there is no factual dispute on the third prong of the test for economic duress.

NFC argues that in *Totem*, the supreme court reversed the superior court's grant of summary judgment under facts very similar to their own. Although it is true that the facts of *Totem* are very similar to those at issue here, there is a very important difference between the *Totem* case and the case at bar. In *Totem*, the parties signed a contract in which one party (Totem) agreed to transport pipeline construction materials from Texas to southern Alaska. "From the start, however, there were numerous problems which impeded Totem's performance of the contract." *Totem*, 584 P.2d at 18. Totem was approximately a month late in performing and the contract was terminated. Totem sought payment, being in urgent need of cash to avoid bankruptcy. Eventually, Totem settled for approximately one-third of the amount claimed and signed a release of all claims. *See id.* at 18–19.

■ Despite the release, Totem sued for breach of contract. The superior court granted summary judgment against Totem based on the release it had signed despite Totem's arguments that the release was signed under economic duress. The supreme court reversed the summary judgment award because, in addition to satisfying the other elements of the test for economic duress, Totem alleged that "Alyeska deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt." *Id.* at 24. Herein lies the difference between *Totem* and the case at bar. In *Totem*, it was alleged that the other party *deliberately* withheld payment of an *acknowledged* debt. Deliberately withholding payment of an acknowledged debt constitutes an action "wrongful in the moral sense" that satisfies the third prong of the test for economic duress. Here, NFC has not produced evidence that UNOCAL ever acknowledged its debt to NFC for the full amount of the cost overruns. All available evidence indicates that UNOCAL never acknowledged an obligation to pay for more than the amount it paid as part of the settlement.

Although NFC argues that UNOCAL is the cause of the overruns and that they *should* have paid for them, UNOCAL's consistent position has been that NFC is at least partly to blame. When it became apparent to NFC that UNOCAL was changing the nature of the project, NFC presumably could have protected itself by insisting on a contract modification before it went ahead with work that was not part of the work it bid for. There is no evidence that UNOCAL took its position or maintained it to exploit NFC's financial weakness.

Unfortunately, the contract between NFC and UNOCAL did not work out as either party expected. NFC was disappointed by UNOCAL's actions that allegedly made performance more complicated, expensive, and time consuming. UNOCAL was disappointed by the cost overruns and delays that eventually led them to terminate the contract with NFC and incur the expense of finding another contractor to finish the platform work. The court's obligation here is not to ascertain who, in fact, should have paid for what percentage of the cost overruns. That matter was settled when the release was signed. The court's only task here is to determine whether UNOCAL did anything improper to coerce NFC to sign the release. NFC may not re-open the dispute over the cost overruns as evidence of coercion in signing the release.

In *Totem*, the improper action was alleged to be the deliberate withholding of an acknowledged debt. Here, NFC's allegation is merely that UNOCAL knew of its difficult financial position and did not accommodate it. Although UNOCAL would not be permitted to exploit NFC's financial weakness, NFC is not allowed to use its financial weakness as a sword to negate a properly executed release. There is nothing in the evidence indicating that UNOCAL treated NFC any different than it would have treated another party in sound economic health. The dispute arose, each party took a position, an offer of compromise was made and accepted, and a release was signed. NFC may not use the courts to re-examine the dispute simply because its financial situation limited its options at the time the release was signed.

The Alaska Supreme Court has noted that "the preservation of agreements entered into in good faith and the encouragement of settlement of disputes constitute strong arguments for enforcing releases." *Witt v. Watkins*, 579 P.2d 1065, 1068 (Alaska 1978). Whatever the merits of the dispute between UNOCAL and NFC over the cost overruns, they settled that dispute. NFC has not presented evidence of improper behavior by UNOCAL in obtaining the settlement and the accompanying release. Therefore, the settlement should remain undisturbed and UNOCAL's summary judgment motion should be granted.

## IV. CONCLUSION

NFC signed a complete release of all claims against UNOCAL. There is no dispute that when the release was signed NFC was in a difficult position financially, at least partially as a result of its contract with UNOCAL. NFC has failed, however, to plead or produce evidence to show that UNOCAL acted improperly in obtaining the release. Therefore, UNOCAL's motion for summary judgment is granted.

SO ORDERED.

DATED at Anchorage, Alaska this 12th day of December, 1997.

/s/ Peter A. Michalski
    Superior Court Judge