Stuart B. McCONNELL, M.D., Appellant,

v.

STATE of Alaska, DEPARTMENT OF
HEALTH AND SOCIAL SERVICES,
DIVISION OF MEDICAL ASSIS-
TANCE, Appellee.

No. S–8492.

Supreme Court of Alaska.

Nov. 5, 1999.

A. Michael Zahare, Matthews & Zahare, Anchorage, for Appellant.

Timothy W. Terrell, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and . CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. *INTRODUCTION*

In this case, Dr. Stuart McConnell, a pediatric psychiatrist, appeals a decision by the Division of Medical Assistance to sanction him for failing to maintain accurate patient records. We affirm.

## II. *FACTS AND PROCEEDINGS*

This appeal arises from two separate, but related, Division actions against McConnell. Both actions concerned allegations that McConnell, a participant in the Medicaid program,[1] violated regulations pertaining to that program.

### A. *The Division's First Action*

The first of these actions came in 1992, when the Division sought to sanction McConnell for violations of several provisions of chapter 43, title 7 of the Alaska Administra-

---

**1.** *See generally* AS 47.07.010–.900 (providing for the State's programs of medical assistance for needy persons, collectively known as "Medic- aid"); 7 Alaska Administrative Code (AAC) 43.005–.1990 (1999) (same).

tive Code (AAC).[2] The Division alleged a number of "problem areas" that warranted sanctions; these centered around McConnell's documentation and billing practices. Because of these violations, the Division decided to suspend McConnell from the Medicaid program for three months and to require McConnell to reimburse it for $89,645 in overpayments. This amount was later increased to $113,917.58.

McConnell appealed this decision. While this appeal was pending, McConnell and the Division entered into a settlement and release agreement. This settlement is dated September 16, 1993 and provides that:

> 1. Dr. McConnell will pay to the Division ... [$60,000] as consideration for the [Division's] release and discharge of all ... claims against Dr. McConnell for reimbursement of any past medical fees paid to Dr. McConnell by the Division ... for the audit period May 23, 1991 through March 31, 1992....
>
> ....
>
> This Settlement Agreement is not applicable to the period before May 23, 1991 and after March 31, 1992....
>
> 2. Dr. McConnell agrees to attend a Provider Education Session....
>
> ....
>
> 5. The Division ... understands and acknowledges that this settlement is in compromise of a disputed claim and that Dr. McConnell's payment of $60,000 and Dr. McConnell's agreement to attend a Provider Education Session is not to be construed as an admission of liability on the part of Dr. McConnell by whom liability is expressly denied.
>
> ....

7. This Settlement and Release agreement contains the entire agreement between the parties hereto and the terms of the release are contractual and not merely a recital. The consideration for this Settlement and Release is the dollar amount to be paid by Dr. McConnell and Dr. McConnell's agreement to attend provider education.

On October 5, 1993, the Division requested five patient files from McConnell to help it prepare for the provider education that was part of the settlement. This letter was signed by Eric S. Hansen, Chief of the Division of Medical Assistance.

McConnell provided the requested files, which the Division forwarded to three physicians: Drs. Martino, Winn, and McCarthy. The cover letters to two of the physicians are part of the record on appeal. According to both letters, the files were being provided to the physicians for the purpose of helping the Division craft an appropriate provider education session for McConnell. The letter to Dr. Martino begins: "Under the settlement agreement between Dr. McConnell and the State, Dr. McConnell agreed to participate in provider education." Similarly, the letter to Dr. Winn states: "The above files are to be reviewed in preparation for providing Dr. McConnell with provider education." The Division did not state that sanctions could arise from its review of these files in either the letters to McConnell or the letters to the reviewing physicians.

On January 31, 1994, Hansen sent a letter to McConnell stating that:

> Pursuant to the settlement agreement you agreed to the sanction of provider

---

2. These provisions were 7 AAC 43.950(2), (6)-(8), and (10), which provide:

(2) submitting or causing to be submitted false information for the purpose of obtaining greater compensation than that to which the provider is legally entitled, including charges in excess of a rate established by the division or the provider's usual and customary charges;

....

(6) engaging in a course of conduct or performing an act considered improper or abusive of the Medicaid program or continuing that conduct following notification that it should cease;

(7) breaching the terms of the Medicaid provider agreement or failure to comply with the terms of the provider certification on the Medicaid claims form;

(8) over-using the medicaid program by inducing, or otherwise causing a recipient to receive services or supplies not required or requested by the recipient;

....

(10) violating any provision of AS 47.07 or any regulation adopted under it[.]

education. In preparation for this provider education we have reviewed a sample of your patient charts and billings for Medicaid patients that were admitted and discharged from May through June 1993.

This is to advise you of our finding that you are in technical compliance with the specifics of our earlier letters regarding use of codes in billing the Medicaid program. As those letters ... have apparently served adequately as "provider education," it will not be necessary to have a face-to-face education session for our purposes. Accordingly, we consider our previous letters to be the "provider education" sanction to which you agreed. If you would still like to schedule a meeting for yourself or your billing people to review this information, we will be available at your convenience.

Please note that we are continuing to review your patient records and will contact you soon regarding our complete findings.

### B. *The Division's Second Action*

Despite these letters, the Division's next communication with McConnell was to inform him that the Division was sanctioning him for violations of 7 AAC 43.950(5)[3] and (46).[4] In this letter, sent on July 6, 1994, Director Kimberly Busch wrote McConnell:

> In preparing for your provider education, [we] conducted a review of your recent billing and charting practices for Medicaid patients.....
>
> While you may or may not be in technical compliance with the limits imposed for billing under certain CPT[5] procedure codes as set forth in our previous letters ..., we have some serious concerns about your chart notes and overall billing patterns.

---

**3.** 7 AAC 43.950(5) states that a provider may be sanctioned for "failing to provide and maintain quality services to medicaid recipients within accepted medical community standards as adjudged by a body of professional peers equivalently licensed to practice in this state."

**4.** 7 AAC 43.950(46) states that a provider may be sanctioned for "failing to maintain for each re-

These alleged violations were discovered by the three doctors mentioned above during their review of the five files that McConnell had provided the Division. Based on these findings, the Division decided to suspend McConnell from the Medicaid program for six months.

McConnell appealed this decision. The matter was heard before a Division hearing officer, Robert Landau, over twenty-seven days, from May 22 to November 20, 1995.

In a thoughtful and thorough 50–page decision, the hearing officer concluded that McConnell could not be sanctioned under 7 AAC 43.950(5) because the quality of the services McConnell had provided had not been "adjudged by a body of professional peers," as that section requires. However, the hearing officer decided that McConnell could be sanctioned under 7 AAC 43.950(46) because McConnell's records were not "accurate"—that is, they did not "conform to a nationally recognized standard such as the CPT." Specifically, the hearing officer found that "many of Dr. McConnell's brief rounding notes do not meet [the CPT] standard because they fail to document either a problem focused history or a problem focused examination."

Taking the relevant factors regarding the proper sanction into account as specified in 7 AAC 43.960, the hearing officer decided that

> a six-month suspension would not be warranted and that provider education is the most appropriate sanction. In view of Dr. McConnell's acknowledged compliance with previous Division instructions; the Division's previous failure to follow through with provider education; the lack of any established record of prior violations or sanctions; and the absence of any evidence of harm arising from Dr. McConnell's charting, the weight of the evidence

---

cipient a contemporaneous and accurate record of the services provided."

**5.** As Appellees point out, " 'CPT' stands for the Current Procedural Terminology system of codes, a billing system universally used by physicians which assigns a code to various ailments and treatments."

supports a sanction that is remedial rather than punitive.

Director Bob Labbe, who had replaced Kimberly Busch, accepted the hearing officer's findings of fact, conclusions of law, and proposed decision. McConnell, however, appealed the decision to the superior court, which affirmed the hearing officer's decision. This appeal followed.

### III. STANDARD OF REVIEW

■ Here the superior court sat as a court of appeal reviewing the decision of the Division of Medical Assistance.[6] In such cases, we independently review the merits of an administrative determination. We give no deference to the superior court's decision when that court acts as an intermediate court of appeal.[7] Because the question here concerns the merits of an agency action on a matter committed to agency discretion, "our scope of review is limited to whether the decision was arbitrary, unreasonable or an abuse of discretion."[8] However, we apply our independent review to the contract interpretation and estoppel issues that McConnell raises.[9]

### IV. DISCUSSION

McConnell makes several arguments in support of his position that the Division is barred from sanctioning him. First, he argues that the Division "contractually obligated itself to furnish to Dr. McConnell [ ] the provider education the Division has now imposed as a sanction." He argues that this provider education was to cover the charting issues for which the Division has sanctioned him, and that if the education had been provided he would not have committed these violations. This argument misses the mark for two reasons: first, the Division had no

contractual duty to provide the education to McConnell; second, its "failure" to provide this education did not cause McConnell's allegedly sanctionable conduct. We discuss each of these issues below.

McConnell also argues that the Division is barred from sanctioning him because it breached the covenant of good faith and fair dealing. Finally, he argues that the Division should be estopped from sanctioning him. As discussed below, these arguments likewise fail.

A. The Division Did Not Have a "Contractual Duty" to Provide McConnell with Provider Education.

■ Examining the language of the settlement agreement makes it apparent that the agreement did not create a "duty" for the Division to provide McConnell with provider education. The relevant portions of the agreement state that "*Dr. McConnell* agrees to attend a Provider Education Session.... The consideration for this Settlement and Release is the dollar amount to be paid by Dr. McConnell and *Dr. McConnell's agreement* to attend provider education." (Emphases added.) Thus, any duty regarding provider education is on *McConnell*'s shoulders, not the Division's.

In other words, McConnell's paying the $60,000 and undergoing provider education were conditions precedent to the Division's duty to release its claim against him. When the Division sent its January 31, 1994 letter stating that "it will not be necessary to have a face-to-face education session for our purposes," it expressly waived its right under the contract to McConnell's performance of that condition.[10] Thereafter the Division no longer had the right to insist that McConnell

---

6. *See* AS 44.62.560(a) (providing for judicial review of administrative orders).

7. *See Bruner v. Petersen*, 944 P.2d 43, 47 n. 5 (Alaska 1997) (citing *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992)).

8. *Kachemak Bay Watch, Inc. v. Noah*, 935 P.2d 816, 822 n. 4 (Alaska 1997) (internal quotation marks omitted) (citation omitted); *see also* 7 AAC 43.960(a) ("The decision as to the sanction to be

imposed will be at the discretion of the director of the division....").

9. *See Oaksmith v. Brusich*, 774 P.2d 191, 195 (Alaska 1989) (contract interpretation); *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 26 (Alaska 1998) (estoppel).

10. *See generally Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978) (discussing requirements for express and implied waiver).

undergo education before it released its claim against him.

Because only McConnell, and not the Division, had any duty with respect to education, it is incorrect to argue that a waiver on the Division's part amounted to a "breach" of the Division's "duty" to give McConnell provider education. No such duty on the Division's part ever existed.

### B. The Division's Failure to Give McConnell the Education Provided for in the Settlement Did Not Cause His Allegedly Sanctionable Conduct.

■ The Division's "failure" to provide McConnell with the education (even assuming for the sake of argument that the Division was, in fact, contractually obligated to provide education to McConnell) did not cause his allegedly sanctionable conduct. McConnell argues repeatedly that whatever "issues" the Division had with his charting and billing procedures "could have been covered in the contractually-promised provider education." Therefore, McConnell asserts, the Division's "breach" of its agreement to give him provider education was to blame for his failure to keep accurate records. This argument fails.

This is so because, as the Division points out, this claim "founders upon the shoals of one of the most basic required elements of a breach claim[:] causation." Because the conduct for which the Division seeks to sanction McConnell was perfected *before* the settlement agreement, any education arising from the settlement would have had no effect on McConnell's conduct during the relevant period.

An examination of the record makes this point clear. The 1994 sanctions were based on the three-doctor panel's review of the five files that McConnell provided to the Division after the September 16, 1993 settlement. The earliest file date was April 14, 1993; the latest was August 20, 1993. Therefore, it defies logic to say that provider education given to McConnell after the September 1993 settlement would have had any impact on his actions from April to August 1993.

### C. The Division Did Not Breach the Implied Covenant of Good Faith and Fair Dealing.

McConnell next argues that the Division violated the covenant of good faith and fair dealing, rendering its sanction subject to reversal. McConnell finds fault with the Division because the files that McConnell provided "to form the basis for provider education [ ] were instead used by the Division to pursue its earlier goal of suspending Dr. McConnell from the Medicaid program." This argument fails as well.

#### 1. McConnell did not waive this argument.

■ The Division argues that this court "could properly reject [this] argument on procedural grounds. It was not clearly raised below." The Division argues that the only mention of this argument comes in a single sentence in McConnell's post-hearing brief, and that this assertion does not suffice to preserve this issue for appeal.

However, McConnell did allege at the agency level that the Division acted in bad faith and that these actions amounted to a breach of the contract. Contrary to the Division's claim that McConnell's assertion of the point "was so opaque" that the hearing officer did not rule on it, the hearing officer did recognize and address McConnell's argument on this issue when he wrote: "Dr. McConnell argues that the Division's unwillingness to go forward with provider education, even after it was requested by Dr. McConnell and agreed to in the settlement agreement, constitutes a bad faith breach of the settlement agreement which precludes the Division from imposing sanctions."

■ We will consider arguments not raised explicitly in the "trial court" (here the Division's agency hearing) if the issue is "1) not dependent on any new or controverted facts; 2) closely related to the appellant's trial court arguments; and 3) could have been gleaned from the pleadings." [11]

11. *State, Dep't of Revenue v. Gazaway*, 793 P.2d 1025, 1027 (Alaska 1990) (quoting *Sea Lion Corp.* *v. Air Logistics*, 787 P.2d 109, 115 (Alaska 1990)) (internal quotation marks omitted).

McConnell's arguments on appeal regarding the covenant of good faith and fair dealing meet all three of these requirements. First, no new facts are alleged, and the relevant facts are not in dispute. Second, the specific argument that the Division breached the covenant of good faith and fair dealing is "closely related" to McConnell's general arguments regarding the Division's alleged bad-faith breaches of the contract. Third, it can be gleaned from McConnell's pleadings before the Division—especially the sentence alluded to by the Division—that McConnell was alleging a breach of the covenant even though he did not invoke the precise phrase "covenant of good faith and fair dealing." Therefore, McConnell did not waive this argument for failure to raise it below.

### 2. *The Division did not breach the implied covenant of good faith and fair dealing*

■■■ It is a long-standing tenet of Alaska law that "[i]n every contract ... there is an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other party to receive the benefits of the agreement." [12] This covenant is implied in every contract "in order to effectuate the reasonable expectations of the parties to the agreement." [13] We have expressed the rationale for this covenant in this way: "The basis for this duty is a hybrid of social policy and an effort to further the expectations of the contracting parties that the promises will be executed in good faith." [14]

■■■ Further, the covenant has both subjective and objective elements. [15] The subjective aspect prohibits one party from acting to deprive the other of the benefit of the contract. [16] The objective element requires each party to act "in a manner that a reasonable person would regard as fair." [17]

The Division breached neither aspect of the covenant here. Accordingly, the Division is not barred from sanctioning McConnell on these grounds.

#### a. *Relevant facts*

The relevant facts are as follows. As discussed above, one of the conditions for the Division's dropping its original claim against McConnell was that he undergo provider education. The Division waived this condition in its letter of January 31, 1994. [18] However, on October 5, 1993—while the condition was still in force—Hansen sent McConnell a letter that began: "The Division ... is preparing a provider education session as mentioned in the settlement agreement. To prepare for this session we request submittal [sic] of copies of your medical and billing records for the five (5) patients listed below with the dates of service for each patient." McConnell duly provided the files.

However, despite its representation to McConnell that the files were to be used to help prepare his provider education, the Division instead took the files and used them as the basis for sanctioning him. As the sanction letter from Busch stated, "[i]n preparing for your provider education, [we] conducted a review of your recent billing and charting practices for Medicaid patients. Three psychiatrists have reviewed five (5) charts and billings...." The Division concluded, based on the three-doctor panel's review of these files, that "your charting does not meet professional medical standards, and you do not provide and maintain quality services to Medicaid recipients within accepted medical community standards." Because of these irregularities, the Division suspended McConnell from the Medicaid program for six months. The Division also threatened to permanently terminate McConnell's partic-

---

12. *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979) (footnote omitted).

13. *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997).

14. *Alaska Pacific Assurance Co. v. Collins*, 794 P.2d 936, 947 (Alaska 1990).

15. *See Chijide v. Maniilaq Ass'n*, 972 P.2d 167, 172 (Alaska 1999) (citing *Ramsey*, 936 P.2d at 133).

16. *See id.* (citing *Ramsey*, 936 P.2d at 133).

17. *Id.* (citing *Ramsey*, 936 P.2d at 133).

18. *See* Part IV.A., *supra*.

ipation in Medicaid unless he addressed these problems.

b. *The Division did not breach the subjective aspect of the covenant.*

The Division's conduct did not deprive McConnell of the benefits of his bargain. The deal reached in the settlement provided that, in exchange for McConnell's paying $60,000 and agreeing to undergo provider education (which was later waived by the Division), the Division would not sanction McConnell for the alleged violations he committed during the period from May 23, 1991 to March 31, 1992. The Division lived up to its side of the bargain, because it did not sanction McConnell for any behavior that took place during the period covered by the settlement agreement. The instant sanction is for behavior that occurred in 1993, well after the end of the period covered by the agreement.

c. *The Division did not breach the objective aspect of the covenant.*

Neither did the Division breach the covenant in an objective sense. The Division is empowered to investigate and sanction any Medicaid provider for violations of Chapter 43, as it did in seeking to sanction McConnell in 1992.[19] Specifically, the Division is empowered by statute to conduct audits and inspections of financial records of Medicaid providers,[20] and by regulation to generally review their records.[21] Therefore, even if the Division had not received the records as part of the settlement agreement with McConnell, his participation in Medicaid entitled the Division to full access to his records. Reasonable people would not find the Division's carrying out its oversight function in this manner to be unfair.

D. *The Division Is Not Estopped from Sanctioning McConnell.*

 McConnell also argues that the doctrine of equitable estoppel bars the Division from sanctioning him. McConnell's specific argument, that the Division's "failure to live up to the terms of its settlement . . . equitably bars the Division's sanction," lacks merit. This is so because, as shown above, the settlement did not require the Division to provide education and because any alleged failure on the Division's part did not cause the sanctionable conduct.[22] Also, as discussed below, McConnell cannot meet the assertion and reliance elements of equitable estoppel.

We have recognized four elements that must be met when estoppel is asserted against the government:

(1) the governmental body asserts a position by conduct or words;

(2) the person acts in reasonable reliance thereon;

(3) the person suffers resulting prejudice; and

(4) the estoppel serves the interest of justice so as to limit public injury.[23]

An analysis of the facts of this case shows that there was no assertion of the Division upon which McConnell relied to his detriment. McConnell's entire argument in this regard is that

the Division asserted a position by conduct or word when it agreed not to sanction Dr. McConnell as part of a 1993 settlement that required the Division to furnish provider education to Dr. McConnell. In entering into the settlement agreement, Dr. McConnell relied upon the Division's promise. He was prejudiced by the Division's decision to sanction him for reasons that should have been covered in provider education.

As noted above, the Division was not "required to furnish provider education to Dr. McConnell." Accordingly, there was no assertion regarding provider education that could satisfy the first element of the estoppel

---

19. *See* AS 47.07.074 (providing for audits and investigations of Medicaid providers); 7 AAC 43.693, 870(h) (same); 7 AAC 43.955 (providing for sanctions).

20. *See* AS 47.07.074(a)(2).

21. *See* 7 AAC 43.870(h).

22. *See* Parts IV.A.-B., *supra.*

23. *Wassink v. Hawkins,* 763 P.2d 971, 975 (Alaska 1988) (citing *Municipality of Anchorage v. Schneider,* 685 P.2d 94, 97 (Alaska 1984)).

test. Moreover, he has not established reliance on his part. If his argument is that he relied on a "promise" to furnish provider education, there was no such promise. If his argument is that he relied on a "promise" not to sanction him, it is unavailing: He was sanctioned for conduct occurring outside of the effective time period of the agreement.

## V. CONCLUSION

Because the Division had no duty to furnish provider education to McConnell, because the failure to furnish provider education did not cause McConnell's sanctionable conduct, because the Division did not breach the duty of good faith and fair dealing, and because the Division is not estopped from sanctioning McConnell, we AFFIRM the sanction imposed by the Division.