HAWKEN NORTHWEST, INC. and ADEC, J.V., Appellants,

v.

STATE of Alaska, DEPARTMENT OF ADMINISTRATION, Appellee.

No. S–10455.

Supreme Court of Alaska.

Aug. 22, 2003.

---

Robert C. Erwin and Roberta C. Erwin, Erwin & Erwin, LLC, Anchorage, for Appellants.

William F. Cummings, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Dale Young/Hawken Northwest, Inc., and ADEC, J.V., (collectively, Hawken) appeal the Department of Administration's decision awarding Hawken $194,097.09 in damages for breach of contract against the State of Alaska. Hawken asserts that it is entitled to significantly greater damages because the two releases it signed were invalid as a result of economic duress; the construction specifications were ambiguous; the department breached the implied covenant of good faith and fair dealing; and the department erroneously denied prejudgment interest. Because the hearing officer's findings and conclusions are supported by substantial evidence and are correct as a matter of law, we affirm the department's decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

In November 1988 the Department of Administration issued an invitation to bid for a lease of laboratory space in Juneau for the Department of Environmental Conservation. The invitation to bid provided for an initial ten-year lease term with options for the department to renew the lease for two additional five-year terms. Because no existing facility in Juneau met the specifications for laboratory space, the invitation effectively required construction of a new building.

Hawken submitted the lowest bid for the laboratory lease, but the department canceled the invitation to bid in March 1989, determining that it was in the department's best interests to reject all bids without an award. Hawken protested, its protest was ultimately upheld, and Hawken was eventually awarded the contract.

On July 24, 1989, state contracting officer Walt Harvey issued a formal notice of the award to Hawken. Two days later, a letter from Harvey advised Hawken that the occupancy date for the new building would be extended in light of the delay in awarding the contract and that the department would sign a lease agreement with Hawken when the laboratory was ready for occupancy. Harvey's letter also reminded Hawken of its obligation to submit a floor plan within forty-five days and evidence of a financial commitment within sixty days. Harvey noted that failure to comply with these deadlines would be cause for default.

Hawken's first financing proposal was a lease-purchase arrangement under which the department would own the building at the end of the lease. The department rejected this proposal as not complying with the invitation to bid requirements and gave Hawken an extension of its sixty-day financing deadline. Hawken next submitted a series of proposals for financing through tax-exempt

bonds issued by various parties. The department was concerned about the potentially adverse consequences for the department's credit rating posed by this kind of arrangement and retained special bond counsel to review the financing proposals.

On October 2, 1989, Hawken requested an extension for the laboratory completion date based on what it saw as the department's delay in reviewing the proposed financing documents. Hawken pointed out that the delay meant that it was now facing a fall start date and winter construction. The department denied the extension, asserting that any delays resulted from Hawken's failure to arrange financing that complied with the invitation to bid. Contracting officer Harvey also stated that Hawken should have anticipated increased costs associated with winter when it submitted its bid.

During this period of financing negotiations, a controversy arose over whether Alaska's Little Davis–Bacon Act[1] would apply to the laboratory construction project. Two Juneau labor unions filed a declaratory judgment action against the department to establish that the project amounted to "public construction" subject to Little Davis–Bacon prevailing wage requirements.[2] The department advised Hawken of the suit and asked whether its bid included sufficient amounts to pay prevailing wages. Hawken responded that its bid was not calculated based on payment of Little Davis–Bacon wages but included sufficient funds to pay them.

At about the same time—October 1989—Hawken requested that the department sign the laboratory lease so that Hawken could pursue tax-exempt financing. The department indicated its reluctance to sign before the building was ready for occupancy but offered to do so in exchange for including lease provisions requiring Hawken to indemnify the department against liability for payment of Little Davis–Bacon Act prevailing wages and to release the department from all claims arising from alleged defects in the invitation to bid specifications. A lease containing these provisions was executed on November 13, 1989.

Numerous construction disputes regarding deadlines, delay, modifications, and increased costs occurred during the year following the lease's signing. An especially thorny controversy arose over the building's heating, ventilation, and air-conditioning (HVAC) system—particularly the ventilation system for the laboratory's fume hoods. Hawken hired an engineering firm, USKH, to prepare the mechanical design plans for the laboratory but initially failed to provide USKH with an amendment to the contract specifications that required a variable air volume fume hood system;[3] Hawken sent USKH the amended specifications only after USKH completed a mechanical design plan specifying a constant volume ventilation system. Hawken proposed USKH's initial plan to the department, maintaining that the constant volume system was an improvement over the variable air volume system specified in the amended invitation to bid and proposing, alternatively, that the constant volume system could be modified to work with variable air volume fume hoods. After consulting with an engineer, the department rejected these proposed alternatives. USKH later redesigned the mechanical plans to provide a variable air volume system, as required by the amended specifications.

Meanwhile, in November 1989, Hawken was still attempting to secure tax-exempt financing for the laboratory project by issuing bonds through a public or non-profit entity. Hawken began negotiating with the City of Kasaan and determined that an assignment of the department lease from Hawken to the city would be required. On January 31, 1990, Hawken requested the department's approval of the proposed assignment. The department's special bond counsel reviewed the proposed financing and raised

1. AS 36.05. This act requires that workers on public construction projects receive at least the current prevailing wage. AS 36.05.010.

2. AS 36.05.010; AS 36.95.010.

3. Amendment 1 to the invitation to bid, which the department issued on December 6, 1988, described numerous changes and additions to the specifications in the original invitation to bid and stated, "All fume hoods shall be variable air volume type."

concerns regarding the department's potential liability on the bonds. The Commissioner of Revenue, a member of the state bond committee, subsequently advised against approving the assignment until these wrinkles could be ironed out.

Hawken requested an additional extension to complete the laboratory, expressing frustration over the department's delay in approving the proposed bond arrangement; the department denied the request, responding that any delays concerning financing were the result of Hawken's proposal of alternative financing approaches that conflicted with the invitation to bid.

To resolve the department's remaining concerns regarding the proposed bond financing, Hawken obtained an irrevocable letter of credit from Sumitomo Trust & Banking Company acknowledging that the department had no liability on the bonds to be issued by the City of Kasaan. On September 14, 1990, the department offered to consent to the assignment of the lease to the City of Kasaan and to extend the occupancy date for the laboratory until April 30, 1991, if Hawken released the department from any claims arising from the delays caused by its review of the lease financing proposals. Hawken agreed to these terms and, on September 27, 1990, executed a release in return for the department's consent to the assignment of the lease to the City of Kasaan.

Although some preliminary construction work had been done before these financing arrangements were completed, most of the construction work occurred between October 1990 and October 1991. The department accepted occupancy of the laboratory on October 26, 1991.

### B. Proceedings

Hawken filed claims for breach of contract under the state procurement code on August 27, 1993, asserting financing and construction damages in excess of seven million dollars. After contracting officer Harvey denied all claims, Hawken appealed to the Commission-

er of the Department of Administration. A fifteen-day administrative hearing was conducted before a hearing officer.

In a 106–page decision, the hearing officer found that a number of factors had delayed construction: Hawken's inability to arrange financing that conformed to the original invitation to bid specifications and the time consumed by Hawken's efforts to arrange alternative financing that met with the department's approval; the need to implement revised mechanical plans for the laboratory's fume hood system; the need to clarify the mechanical, electrical, and equipment specifications in the original invitation to bid; severe winter weather conditions; Hawken's deficient project management; and Hawken's installation of a sprinkler system instead of the originally specified Halon fire suppression system. The hearing officer also found that both the releases signed by Hawken were valid and that they effectively released all construction claims against the department through September of 1990. Based on these findings, the hearing officer recommended awarding Hawken only $194,097.09 in damages, plus prejudgment interest on its award. On remand from the commissioner, however, the hearing officer reconsidered the award of prejudgment interest and concluded that it was not legally permissible. The commissioner adopted the hearing officer's amended recommendations, and the superior court affirmed the department's decision in all respects. Hawken appeals.

### III. DISCUSSION

#### A. Standard of Review

 We independently review decisions made by the superior court as an intermediate court of appeal.[4] When reviewing an administrative decision, we apply our independent judgment to resolve questions of law not involving agency expertise.[5] We review agency factfinding under the substantial evi-

---

4. *Anderson v. State, Dep't of Revenue,* 26 P.3d 1106, 1108–09 (Alaska 2001); *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

5. *E.g., Anderson,* 26 P.3d at 1109.

dence test,[6] upholding the findings when they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7] If the agency's findings are supported by substantial evidence, we "do not choose between competing inferences or evaluate the strength of the evidence."[8]

## B. Hawken's Releases

Hawken signed two releases: the first was incorporated into the November 13, 1989, Standard Lease Form, and the second was the September 27, 1990, Agreement and Mutual Release. Hawken argues that both are void because they were signed under economic duress.

A signed release agreement may only be invalidated for economic duress when (1) one party involuntarily accepted the terms of another, (2) circumstances permitted no other alternative, and (3) the circumstances were the result of coercive acts by the other party.[9] The party claiming economic duress must prove all three prongs by clear and convincing evidence.[10]

The test for the first prong simply requires an assertion of subjectively involuntary acceptance.[11] Hawken's claim of economic duress satisfied this prong.[12]

The second prong's determination of whether an alternative to accepting the release terms was available is objective.[13] It required Hawken to show that it had "no reasonable alternative to agreeing" to the department's terms or "no adequate remedy

if the [department's] threat were to be carried out."[14] Whether a reasonable alternative existed is a question of fact that depends on the circumstances of the case.[15] "An available legal remedy, such as an action for breach of contract, may provide such an alternative," but may be inadequate "where the delay involved in pursuing that remedy would cause immediate and irreparable loss to one's economic or business interest."[16]

Under the third prong, Hawken was required to show that the department intentionally caused it to enter into the releases through "wrongful acts or threats."[17] Wrongfulness depends on the circumstances of the case but may be proved by conduct that is criminal, tortious, or morally reprehensible.[18] In addition to proof of coercive acts by the other party, the third prong requires a causal link between those acts and the circumstances of the releasing party's economic duress.[19]

### 1. November 1989 release

In November 1989 Hawken agreed to sign a release in exchange for the department's agreement to sign a lease on the new laboratory building in advance of its construction. The release, which was incorporated into the lease agreement, required that Hawken indemnify the department for Little Davis–Bacon wage claims and released the department from any and all claims by Hawken related to the department's actions or omissions in soliciting bids under its invitation to bid.

---

6. *E.g., id.*

7. *Handley,* 838 P.2d at 1233 (quotation marks omitted) (quoting *Keiner v. City of Anchorage,* 378 P.2d 406, 411 (Alaska 1963)).

8. *Lopez v. Adm'r, Pub. Employees' Ret. Sys.,* 20 P.3d 568, 570 (Alaska 2001); *see also Anderson,* 26 P.3d at 1109.

9. *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15, 21 (Alaska 1978).

10. *Helstrom v. N. Slope Borough,* 797 P.2d 1192, 1197 (Alaska 1990).

11. *Zeilinger v. SOHIO Alaska Petroleum Co.,* 823 P.2d 653, 657 (Alaska 1992).

12. *See N. Fabrication Co., Inc. v. UNOCAL,* 980 P.2d 958, 960 (Alaska 1999) (describing first prong requirement as "almost meaningless").

13. *Zeilinger,* 823 P.2d at 658.

14. *Totem Marine,* 584 P.2d at 22.

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. *Zeilinger v. SOHIO Alaska Petroleum Co.,* 823 P.2d 653, 658 (Alaska 1992).

The hearing officer found that the 1989 release was valid and not the product of economic duress, ruling that Hawken had failed to satisfy prongs two and three of the economic duress test, because Hawken had other reasonable alternatives and the department did not engage in coercive conduct or cause Hawken's financial instability.

As to the second prong, the hearing officer noted that construction had not yet begun when Hawken signed the release and that Hawken had not yet entered into any major subcontractor agreements. Because Hawken had made no binding financial commitments at this early stage, the hearing officer reasoned, the company had failed to prove that executing the release was its only reasonable alternative. In addition, the officer found that Hawken had confirmed that its original bid included enough to pay the Little Davis–Bacon wages. The officer decided that "[u]nder these circumstances, Hawken has not persuasively demonstrated that pursuing a contract claim or lawsuit would have caused immediate and irreparable loss to Hawken's economic interests."

With regard to the third prong, the hearing officer determined that the department's conduct did not amount to "a wrongful exploitation of Hawken's financial and bargaining position." The officer found that Hawken derived a significant benefit from the release agreement because the agreement required the department to execute a premature lease, which entitled Hawken to pursue tax-exempt financing. Thus, in the hearing officer's view, Hawken received ample consideration for the release and indemnification. Moreover, the hearing officer found no evidence of improper conduct on the department's part and noted, "[e]ven if [the department's] conduct [was] considered to be coercive or wrongful, there was no causal link between such conduct and [Hawken's] financial condition." Instead, the hearing officer attributed Hawken's troubled finances to a stagnant local economy and difficulties with other projects and investments.

Hawken contends that the hearing officer's findings are not supported by substantial evidence. Hawken asserts that it was in a severe financial condition, on the verge of bankruptcy, and that its desperate situation was communicated to the department. The company argues that it would have lost everything if it did not agree to sign the release because it could not build the laboratory without the financing, which it could not obtain without the signed lease. Thus, Hawken claims, it was forced to accept the department's terms. According to Hawken, pursuit of a contract claim under these circumstances, which the hearing officer found to be a reasonable alternative, would have resulted in bankruptcy for the company.

■ But substantial evidence supports the hearing officer's findings on the existence of reasonable alternatives. As the hearing officer noted, Hawken had not begun construction, had not signed any major subcontracts, and had not yet managed to obtain approved financing. Although Hawken insists that the financing it desperately needed depended on the department's willingness to sign a long-term lease for the laboratory, the terms of Hawken's contract obligated the department to lease the building only upon its completion. The release agreement thus required important concessions by both parties: in return for Hawken's release of potential claims, the department gave up its right to wait for the laboratory's completion before entering into a binding lease.

■■ Moreover, while Hawken's available alternatives may well have resulted in further delay, the record supports the hearing officer's finding that Hawken failed to establish that the delay would have caused immediate and irreparable loss. Hawken repeatedly asserts that it would have been forced into bankruptcy if it had not agreed to the release, but it fails to identify any substantial evidence to support these assertions.[20] Because the hearing officer's finding

**20.** The record citations in Hawken's brief refer to the following: testimony that Hawken's owner, Dale Young, was worried about the company's finances on an unspecified date; Young's testimony that his real estate holdings were in danger sometime during the period between December 1988 and March of 1989; and testimony that at the time of the release, there was concern about

that Hawken failed to prove economic duress is not clearly erroneous, we affirm his conclusion that the November 1989 release was validly executed.

Our holding on this point makes it unnecessary to consider whether Hawken met its burden of establishing that the department engaged in the coercive conduct that caused its financial duress.

## 2. September 1990 release

Hawken signed the second release in exchange for the department's consent to Hawken's assignment of the laboratory lease to the City of Kasaan. The language of this release agreement explicitly acknowledged that Hawken had a potential claim against the department for failing to promptly consent to the assignment and that the department had a potential claim against Hawken for its failure to deliver the laboratory building on deadline. Under the agreement, the occupancy deadlines were extended and the parties released each other from "any and all claims" related to the assignment and lease amendment dispute referred to in the agreement.

The hearing officer upheld this release, finding that Hawken had met its burden of proving involuntariness and the lack of a reasonable alternative but had failed to prove that its situation was caused by the department's misconduct. The hearing officer found that "by September 1990 Hawken's financial and contractual commitments to the laboratory project were so substantial that the delay involved in pursuing a legal remedy would likely have caused immediate and irreparable economic harm, potentially including bankruptcy." Moreover, the hearing officer noted, Hawken had spent considerable time and expense in preparation for the bond sale. Given these circumstances, the hearing officer was convinced that "by the time the bond closing occurred in September 1990, Hawken's economic circumstances did not

permit a reasonable alternative or adequate remedy at law to signing the mutual release."

But the hearing officer remained unconvinced that the department coerced Hawken into signing the release by engaging in wrongful actions. The officer found that Hawken's decision to pursue tax-exempt financing was the primary cause of its strained financial condition and, consequently, that "the circumstances of Hawken's duress were largely of its own making, not the result of the [department's] improper or coercive conduct." Moreover, the hearing officer found, the release was not exploitive; it entailed a compromise of substantial and genuinely disputed claims by both sides: Hawken released its potential claims relating to the department's delay in approving Hawken's lease assignment; and by extending the deadline for completion, the department relinquished its potential claims for Hawken's delay in delivering a completed building. Thus, the hearing officer found insufficient evidence of misconduct and causation.

Hawken challenges these findings as unsupported and clearly erroneous, contending that the release was tantamount to a threat because it was executed on the eve of the bond sale and the department knew that Hawken would be forced into bankruptcy if the bond sale failed.

The department disputes Hawken's characterization of the events preceding the release, contending that Hawken had the opportunity to consult with counsel before agreeing to the release and could have changed its mind during the thirteen-day period between the date Hawken notified the department of its agreement and the date of the release's execution. According to the department, the release was simply a reasonable business decision by both parties.

In our view, the record supports the department's position on this point, which is in accord with the hearing officer's findings. Although Hawken presented evidence to support its position, the hearing officer could

Hawken's possible exposure for the difference in bids if the department canceled the award and went with the next lowest bidder. This testimony provides only weak support for Hawken's assertion that bankruptcy was certain if the signed lease was not obtained. These after-the-fact expressions of subjective concern are not substantial evidence sufficient to establish clear and convincing proof of immediate and irreparable economic loss.

properly weigh the conflicting evidence and decide that its evidence was less credible.

■ Hawken also maintains that the department's conduct was wrongful because the department knew that the bond sale would collapse unless the lease was assigned and took unfair advantage of the situation by demanding the release. But it is unclear whether the department's contract with Hawken obliged it to consent to the proposed lease assignment. More important, as already noted, the release was mutual, involving a relinquishment of substantial claims by both parties. Given these circumstances, the hearing officer could properly find that Hawken failed to prove any conduct by the department that was criminal, tortious, or even ethically wrongful.[21]

■ More fundamentally, the hearing officer could properly find that Hawken failed to prove a clear causal link between the department's opportunistic conduct and the circumstances that left Hawken with no choice but to agree to the release. Although Hawken insists that the department took unfair advantage of Hawken's financial instability, it fails to explain how the department's alleged misconduct caused those financial difficulties. As we have held, "economic necessity—very often the primary motivation for compromise—is not enough, by itself, to void an otherwise valid release."[22]

The facts in this case are analogous to those in *Northern Fabrication Co., Inc. v. UNOCAL*, where we stated that a party "is not allowed to use its financial weakness as a sword to negate a properly executed release."[23] There, the plaintiff seeking to void the release agreement, Northern Fabrication, attributed problems that led to significant cost overruns and delays to the defendant, UNOCAL.[24] UNOCAL offered to compromise by paying half of the cost overrun; after six weeks, Northern Fabrication accepted UNOCAL's offer and signed a general release.[25]

Alleging that UNOCAL knew of Northern Fabrication's bankruptcy history, Northern Fabrication argued that the company exploited Northern Fabrication's distressed financial condition by offering only half of what UNOCAL owed.[26] We nevertheless upheld the release, finding that Northern Fabrication had failed to establish the third prong of the economic duress test because it had not produced clear and convincing evidence of either a coercive act on UNOCAL's part or a causal link between UNOCAL's conduct and Northern Fabrication's shaky finances.[27] We concluded, under those circumstances, that "[c]learly the dispute with UNOCAL contributed to Northern Fabrication's financial instability. However, without evidence that UNOCAL did anything criminal, tortious or even merely wrongful in the moral sense, there is no factual dispute on the third prong of the test for economic duress."[28]

Our holding in *Northern Fabrication* governs this case. Like Northern Fabrication, Hawken "may not use the courts to re-examine the dispute simply because its financial situation limited its options at the time the release was signed."[29] Because the record supports the hearing officer's finding that Hawken failed to establish either coercive misconduct or a causal connection, we uphold the hearing officer's conclusion that the September 1990 release was valid.

Our affirmance of the hearing officer's findings that Hawken failed to prove misconduct or bad faith by the department in connection with the 1989 and 1990 releases necessarily forecloses Hawken's separate claims

---

**21.** *See Totem Marine,* 584 P.2d at 22.

**22.** *Zeilinger,* 823 P.2d at 658 (holding no economic duress by employer where inducement to release claims was employee's burdensome financial circumstances that were of her own making).

**23.** 980 P.2d 958, 962 (Alaska 1999).

**24.** *Id.* at 960.

**25.** *Id.*

**26.** *Id.*

**27.** *Id.* at 961.

**28.** *Id.* (quotation marks omitted) (quoting *Helstrom v. N. Slope Borough,* 797 P.2d 1192, 1198 (Alaska 1990)).

**29.** *Id.*

that the department violated the covenant of good faith and fair dealing in obtaining these releases.

## C. Ambiguity of the HVAC Specifications

■ Hawken claims various damages in connection with the department's insistence that the HVAC system be redesigned to use a variable air volume system rather than a constant volume system, as required by the amended specifications. Hawken claims that the original construction specifications were "performance specifications," rather than "design specifications." According to Hawken, this gave it sole discretion to design and construct any type of HVAC system that would meet the performance specifications. Because its constant flow system met the specified performance standards, Hawken alleges that the department should bear the cost of requiring Hawken to change to a variable air volume system.

But the hearing officer concluded that this claim would be barred under Hawken's 1989 release, even assuming that it had legal merit. We agree. The November 1989 lease release covered all claims "directly or indirectly" related to the department's "actions or omissions in soliciting bids for laboratory and office space under [the invitation to bid]." Since the plain language of the release applies to the HVAC claim, our decision that the release is valid disposes of the claim.

Our conclusion on this point also disposes of Hawken's related argument that the department's rejection of its HVAC design violated the covenant of good faith and fair dealing.

## D. Implied Covenant Claim

Hawken claims that the department used its superior bargaining position to impose numerous roadblocks and unreasonable demands and maintains that the department's lack of cooperation doubled the cost of construction and cost Hawken ownership of both the building and the lease. According to Hawken, this conduct amounted to a breach of the covenant of good faith and fair dealing.

■ The covenant of good faith and fair dealing is implied in every contract to give effect to the reasonable expectations of the parties, preventing each party from interfering with another party's right to receive the benefits of the agreement.[30] The implied covenant has both a subjective and an objective prong.[31] "The subjective prong prohibits one party from acting to deprive the other of the benefits of the contract." [32] The objective prong requires both parties to act in a way that a reasonable person would consider fair.[33]

### 1. Cancellation of bids

■ During the interim period between the department's cancellation of the invitation to bid and its reinstatement after Hawken's protest, the department was engaged in discussions with the University of Alaska and the U.S. Forest Service regarding a joint laboratory facility construction project. Hawken asserts that the department breached the covenant of good faith and fair dealing by rejecting all bids and secretly using Hawken's bid as a benchmark for negotiations regarding the joint laboratory.

The hearing officer found this claim to be meritless, ruling that the department's decision to cancel all bids was not made in bad faith and that, in any event, Hawken was estopped from asserting this claim by its successful renewal of its bid.

Although we believe that substantial evidence supports the hearing officer's findings, we need not decide the point on its merits, since it is barred by the November 1989 release, which covers all claims directly or indirectly related to the department's conduct in soliciting bids.

---

**30.** *McConnell v. State, Dep't of Health & Soc. Servs.*, 991 P.2d 178, 184 (Alaska 1999); *accord* Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

**31.** *McConnell,* 991 P.2d at 184.

**32.** *Id.*

**33.** *Id.*

## 2. Imposition of deadlines

■ Hawken next claims that the department breached the covenant of good faith and fair dealing by stalling its award of the contract and then threatening Hawken with immediate default unless it submitted scale drawings in forty-five days and proof of financing in sixty days. The department responds that it merely reminded Hawken of applicable contractual deadlines—deadlines that Hawken had chosen to accept.

The hearing officer rejected Hawken's claim, finding that "the [department's] notification of potential default in the event of noncompliance with the [invitation to bid] was consistent with the contract, was not a threat to breach the contract, and was not done in bad faith."

We agree. Substantial evidence supports the finding of a lack of subjective bad faith, and it was not objectively unfair for the department to remind Hawken of its contractual obligations.

## 3. Financing delays

■ Hawken also maintains that the department breached the covenant of good faith and fair dealing by delaying its approval of Hawken's proposal to arrange financing through tax-exempt bonds. The hearing officer found the department's delay reasonable in light of the bonding proposal's novelty and complexity. But we need not reach the merits of this claim, since it is barred by the 1990 release. After recognizing that Hawken had potential claims against the department for failing to promptly consent to its bond proposal, the 1990 release agreement expressly released the department from "any and all claims" related to this delay. Our decision upholding the release thus disposes of this claim.

## E. Prejudgment Interest on Hawken's Award of Damages[34]

■ The hearing officer initially recommended that interest be awarded on Hawken's damages from the date of the department's occupancy of the laboratory until paid. The Commissioner of Administration remanded the matter, directing the hearing officer to reconsider whether the commissioner had authority to award interest on a claim under the state procurement code. The hearing officer concluded on reconsideration that Hawken was not entitled to prejudgment interest on the damages awarded. Hawken challenges this conclusion.

■ We have consistently stated that prejudgment interest may not be assessed against the state unless specifically authorized by legislation.[35] "In other words, only the legislature can waive the state's sovereign immunity and authorize an award of prejudgment interest against the state." [36]

Hawken filed its claims under the state procurement code,[37] the claims are "contract controversies" under AS 36.30.620,[38] and they were appealed under AS 36.30.625.[39] The procurement code does not specifically authorize prejudgment interest on awards under these provisions.

---

34. Our decision upholding the releases and rejecting Hawken's implied covenant claims makes it unnecessary to decide any aspect of Hawken's arguments on damages except prejudgment interest. Hawken acknowledges that the damages issue is "somewhat murky," but asserts that "if th[is] court decides that there is bad faith or the releases are invalid," we should require a hearing to reconsider damages. Although Hawken devotes numerous pages to a discussion of the specific aspects of damages that it claims were incorrectly awarded, its arguments appear to be offered to establish the need for a remand in the event that Hawken prevails on either the economic duress or the covenant claims.

35. *Samissa Anchorage, Inc. v. State, Dep't of Health & Soc. Servs.*, 57 P.3d 676, 679 (Alaska 2002); *Danco Exploration, Inc. v. State, Dep't of Natural Res.*, 924 P.2d 432, 434 (Alaska 1996); *Stewart & Grindle, Inc. v. State*, 524 P.2d 1242, 1245 (Alaska 1974).

36. *Samissa*, 57 P.3d at 679.

37. AS 36.30.

38. AS 36.30.620 provides, in part: *"Contract controversies.* (a) A contractor shall file a claim concerning a contract awarded under this chapter with the procurement officer."

39. AS 36.30.625 provides, in part: *"Appeal on a contract controversy.* (a) An appeal from a decision of the procurement officer on a contract controversy may be filed by the contractor with the commissioner of administration...."

A provision allowing prejudgment interest on awards against the Department of Transportation and Public Facilities was added to the procurement code after Hawken filed this suit.[40] Hawken asserts that this provision applies to all cases pending on the provision's effective date. But the legislature specified that the prejudgment interest provision would apply only to "[c]ontroversies for which a claim *is filed* with an agency ... on or after the effective date of this act."[41] Because Hawken did not file its action on or after the statute's effective date, the new provision does not apply.

Since the procurement code does not provide a basis for Hawken's prejudgment interest claim, its claim could only be granted if it fell under AS 09.50.280.[42] We have recently interpreted this statute in cases similar to Hawken's, concluding that it does not authorize awards of prejudgment interest against the state in administrative appeals.[43] These decisions directly control Hawken's claim and preclude an award of prejudgment interest.

## IV. CONCLUSION

We AFFIRM the department's award.

CARPENETI, Justice, not participating.

**40.** AS 36.30.623 provides, in part: *"Interest on certain controversies.* The amount ultimately determined to be due ... accrues interest at the [statutory] rate applicable to judgments.... In this section, "department" means the Department of Transportation and Public Facilities."

We assume for present purposes that this provision would extend to de facto construction contract claims filed against agencies other than the Department of Transportation and Public Facilities. Our conclusion that the statute did not apply retroactively to Hawken's claim makes it unnecessary to decide the issue here.

**41.** Ch. 98, § 4, SLA 2001 (emphasis added).

**42.** AS 09.50.280 authorizes prejudgment interest against the state for certain contract, quasi-contract, and tort claims covered by AS 09.50.250.

**43.** *See Quality Asphalt Paving, Inc. v. State, Dep't of Transp. & Pub. Facilities,* 71 P.3d 865, 878–80 (Alaska 2003); *Samissa Anchorage, Inc. v. State, Dep't of Health & Soc. Servs.,* 57 P.3d 676, 680 (Alaska 2002); *Danco Exploration, Inc. v. State, Dep't of Natural Res.,* 924 P.2d 432, 434 (Alaska 1996).